102 Cal.App.3d 689 (1980)
163 Cal. Rptr. 464
SONOMA COUNTY BOARD OF EDUCATION, Plaintiff and Appellant,
v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Defendant and Respondent; SONOMA COUNTY ORGANIZATION OF PUBLIC EMPLOYEES, Real Party in Interest and Respondent.
Docket No. 45339.
Court of Appeals of California, First District, Division One.
February 28, 1980.
*691 COUNSEL
V.T. Hitchcock and Rene Auguste Chouteau for Plaintiff and Appellant.
William P. Smith, Allen R. Link and Terry Filliman for Defendant and Respondent.
Peter M. Renkow and Doty & Renkow for Real Party in Interest and Respondent.
*692 OPINION
RACANELLI, P.J.
The 1975 Educational Employment Relations (Rodda) Act (Gov. Code, § 3540 et seq.) authorizes public school employees to join employee organizations for purposes of exclusive representation with public school employers on matters pertaining to employment relations including "wages." (Gov. Code, § 3543.2.) The preexisting statutory scheme mandating the implementation of a civil service or merit system for classified employees in a county school district (Ed. Code, §§ 1317, 45240 et seq.)[1] prohibits any (salary) changes which effectively "disturb the relationship which compensation schedules bear to one another" as established by the personnel commission (§ 45268). A 1977 statutory amendment requires commission rules covering matters which are the subject of negotiation under the Rodda Act to be "in accordance with the negotiated agreement" (§ 45261, subd. (b)). In this appeal, we consider whether a conflict exists between the related statutes and the implications, if any, of such conflict.
The relevant facts are undisputed. During the course of negotiations between appellant Sonoma County Board of Education (Board) and the Sonoma County Organization of Public Employees (SCOPE), the exclusive bargaining representative in behalf of the Board's nonsupervisory classified employees, SCOPE became aware of a pending study by the Board's duly constituted personnel commission (Commission) related to salaries of various classified positions and the proposed realignment or reclassification of certain positions on the salary schedule. SCOPE then demanded that the Board meet and negotiate regarding the salaries of individual job classifications within its representative unit; the Board rejected such claim on the grounds that the matter of salaries and salary ranges fell within the exclusive province of the Commission and was thus beyond the scope of negotiations. Following a hearing on charges of unfair practices filed by SCOPE, respondent Public Employment Relations Board (PERB)[2] determined that the Board's refusal to meet and negotiate the question of salaries to be paid to individual job classifications violated the statutory prohibition (Gov. Code, § 3543.5, subd. (c)) and issued a "cease and desist order" with the proviso that the Board had no obligation to bargain on proposals which would change the relationship of individual job classifications *693 as established by the Commission within an occupational group. Upon the hearing of the Board's petition for mandamus relief and the PERB's cross-petition for enforcement (see Gov. Code, § 3542, subd. (b)), the trial court entered a judgment enforcing the challenged decision. The Board appeals from the judgment.[3]

Issue Presented
The appeal presents an issue of first impression: whether section 45268 effectively precludes a governing school board from negotiating wages for individual job classifications.[4]

Contentions
The Board renews its contention below that the underlying purpose and function of the merit system evidences a legislative intention that the collective bargaining provisions of the Rodda Act be subordinate to the existing merit system and rules providing for the establishment of classified salaries and salary ranges. Though the Board has ultimate authority to set such salaries, it is argued that only the Commission has jurisdiction to make final decisions affecting the relationship which salaries bear to each other on the salary schedules.[5] Thus, it is concluded, the Board's power to negotiate salary matters is limited to changes which uniformly affect all classifications. The PERB counters that the only restriction imposed under section 45268 upon the Board's duty to meet and negotiate salaries or wages is that it may not fix such salaries *694 in a manner which disturbs the classification relationship within an individual occupational group. In essence, the PERB argues that the Board is free to negotiate salaries within individual job classifications so long as the relationship established by the Commission of one job to another within the same occupational group (job ranking) remains unchanged.[6] While generally agreeing with the PERB's position, SCOPE further argues that the Board's inflexible interpretation of the statutory restriction would empower it to unilaterally determine wages for individual employees allowing existing wage inequities to remain immutable, thus effectively subverting a basic purpose of the collective bargaining statutes.
We begin our discussion with a brief review of the origin of the merit system in government employment and the evolution of collective bargaining legislation in the public sector, particularly as related to local educational employment.

The Merit System
The introduction of the merit principle into the field of governmental employment is rooted in the belief that employees should be recruited, selected and advanced under conditions of political neutrality, equal opportunity and competitive merit. (See Grodin & Wollett, Labor Relations and Social Problems: Collective Bargaining in Public Employment (2d ed. 1975) pp. 162-163; see also 3 McQuillen, Municipal Corporations (3d ed. 1969) §§ 12.55, 12.76.) The implementation of that principle through the establishment of merit or civil service systems in the public sector had as its principal focus the removal of political or other extraneous considerations in favor of those based upon relative competence and fitness. (Hanley v. Murphy (1953) 40 Cal.2d 572, 577 [255 P.2d 1]; Grodin & Wollett, op. cit. supra, at p. 162.) The gradual development of modern personnel administration in the public sector witnessed a shift in emphasis from such original focus to one of a greater concern for economy and efficiency in government resulting in the merger of traditional merit systems into comprehensive programs of personnel management initiated and administered by the government employer. (Grodin & Wollett, op. cit. supra, at p. 162.)
Under the authority of a 1935 legislative mandate (see § 1317), merit systems were introduced into local public school personnel administration *695 in accordance with a comprehensive statutory scheme. (§ 45240 et seq.) The statutory model established an independent personnel commission (§ 45243) charged with the duty to classify all school

 Salary Occupational Groups
 Ranges (A) (B) (C)
 -------------------------------------------------------------------------
 | | | | |
 | 820-996 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 802-974 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 783-951 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 767-931 | Acct. Clk. IV | | Admin. Secty. |
 | | (T) | | (T) |
 |---------------|-----------------|----------------------|----------------|
 | 749-909 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 732-889 | Acct. Clk. III | | |
 |---------------|-----------------|----------------------|----------------|
 | | | | |
 | 716-872 | | Custodian II | |
 |---------------|-----------------|----------------------|----------------|
 | | | | |
 | 700-852 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 685-833 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 670-815 | Acct. Clk. II | Cook | Clk. Steno III |
 |---------------|-----------------|----------------------|----------------|
 | 654-795 | Varitypist | Custodian I | Clk. Typ. III |
 |---------------|-----------------|----------------------|----------------|
 | 642-780 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 627-762 | | | Clk. Steno II |
 |---------------|-----------------|----------------------|----------------|
 | 613-746 | Acct. Clk. I | Cook's | |
 | | | Helper | |
 |---------------|-----------------|----------------------|----------------|
 | 699-728 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 687-713 | | | Clk. Typ. II |
 |---------------|-----------------|----------------------|----------------|
 | 573-697 | | | Clk. Steno I |
 |---------------|-----------------|----------------------|----------------|
 | 661-681 | | Cafe. Asst. | |
 |---------------|-----------------|----------------------|----------------|
 | 649-667 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 637-653 | | | Clk. Typ. I |
 |---------------|-----------------|----------------------|----------------|
 | 625-638 | | | |
 |---------------|-----------------|----------------------|----------------|
 | 613-624 | | | |
 -------------------------------------------------------------------------

The Board contends it is only authorized to adjust the amount of compensation fixed in the salary ranges column so as to produce a uniform "across-the-board" salary change in all three occupational groups, thus maintaining the same relative alignment between job positions in each group. Under the PERB's analysis, salary increases or decreases between job classifications in each column are permissible so long as the relative job rankings within that column remain unchanged; in its view, any resulting change in job salary levels between columns is irrelevant. Thus, for example, the Board would be authorized to negotiate a salary increase for an "Acct.Clk. II" classification in column "A" so long as it did not equal or exceed the salary level established for the next higher classification of "Acct.Clk. III" without regard to the resulting change in relation to the level of compensation set for the positions of "Cook" or "Clk.Steno III" in column "B" or "C" respectively. *696 employees and positions not otherwise expressly exempted[7] (§ 45256; see also § 45258) and to enact rules binding upon the governing board designed to promote efficiency and merit employment (§ 45260). Such rules are to provide procedures to be followed by the governing board applicable to the classified service concerning  inter alia  "compensation within classification" (§ 45261, subd. (a)). Although the governing board alone is empowered to fix the compensation for those employed within the classified service (§§ 45160, 45267; see Los Angeles City etc. Employees Union v. Los Angeles City Bd. of Education (1974) 12 Cal.3d 851, 856-857 [117 Cal. Rptr. 537, 528 P.2d 353]), the Commission is authorized to recommend salary schedules for the classified service which the governing board may approve, amend or reject, provided that no changes shall operate to disturb the relationship between compensation schedules established in the classification by the Commission. (§ 45268;[8]Los Angeles City etc. Employees Union v. Los Angeles City Bd. of Education, supra, at p. 853, fn. 1.) The controversy centers upon the limits of the restriction imposed under the final sentence of section 45268 relevant to the Commission's authority implemented under its rules to designate the "salary range" for each class (rule 30.200.2) pursuant to the salary recommendations submitted for consideration by the Board which "... may not alter the relationships among classes as established by the classification plan." (Rule 70.100.3.)
While the question whether board-initiated salary changes between classes would result in an impermissible disturbance in classification relationships has never before been decided, the meaning and effect of the statutory language (former Ed. Code, § 13719) were carefully analyzed in a 1971 opinion of the Attorney General. (54 Ops.Cal.Atty.Gen. 77 (1971).) In concluding that the word "changes" did not prevent the governing board from adopting salary proposals initiated by other interested parties or sua sponte, the Attorney General reasoned that changes in the salary differential between two nonequal positions did not inevitably result in disturbing the classification relationship "... so *697 long as each [position] remains effectively higher or lower as such relative relationships have been established by the personnel commission classification." (Id., at p. 85.)[9]
Notwithstanding the enactment of subsequent legislation impacting employer-employee relations within the public education sector (discussed below), the relevant statutory language as interpreted by the Attorney General remains unchanged. However, following the 1975 Rodda enactment providing that merit or civil service system rules may not conflict with lawful collective bargaining agreements (see Gov. Code, § 3540, post), the Legislature amended a related statute requiring that the rules with respect to identified bargaining matters be consistent with the "negotiated agreement."(§ 45261, subd. (b).)[10]

Public Sector Collective Bargaining
Until the enactment of the George Brown Act in 1961 (Stats. 1961, ch. 1964, § 1, p. 4141, former Gov. Code, §§ 3500-3509), the right of collective bargaining concerning the terms and conditions of public employment was not recognized under California law. (See Martin v. Henderson (1953) 40 Cal.2d 583, 590-591 [255 P.2d 416]; Nutter v. City of Santa Monica (1946) 74 Cal. App.2d 292 [168 P.2d 741].) In according government employees the right to organize collectively and to confer with management on the terms and conditions of employment, the act heralded a period of progressive legislation in the public sector governing employer-employee relations. (See Glendale City Employees' Assn., Inc. v. City of Glendale (1975) 15 Cal.3d 328, 331, 335, fn. 5 [124 Cal. Rptr. 513, 540 P.2d 609], cert. den., 424 U.S. 943 [47 L.Ed.2d 349, 96 S.Ct. 1411].) A few years later the Legislature adopted the Winton Act (Stats. 1965, ch. 2041, § 1, p. 4660, former Ed. Code, §§ 13080-13088) which established a separate statutory framework recognizing public school employees' right to meet and confer *698 with employer school districts and merit system personnel commissions (former Ed. Code, § 13081, subd. (b)) concerning employment relations and conditions, including wages (former Ed. Code, § 13084; see City and County of San Francisco v. Cooper (1975) 13 Cal.3d 898, 909 [120 Cal. Rptr. 707, 534 P.2d 403]). Similar recognition was extended to local government employees through enactment of the 1968 Meyers-Milias-Brown Act (Gov. Code, §§ 3500-3510). As a result of an awareness of the increasing problems impacted by collective bargaining trends in areas traditionally occupied exclusively by merit or civil service systems, the Legislature undertook a detailed study to evaluate the existing statutory scheme regulating public employer-employee relations and to consider available alternatives in an attempt to accommodate the competing interests and objectives. (See Final Rep. of the Assem. Advisory Council on Public Employee Relations (Mar. 15, 1973).) The comprehensive 1975 Rodda Act, repealing and replacing the former Winton Act, was a product of that effort.[11]
The language expressing the legislative purpose and objectives is clear and unmistakable: to improve personnel management and employer-employee relations within the public school systems "... by providing a uniform basis for recognizing the right of public school employees to join organizations ... [and] ... to be represented by such organizations in their ... employment relationships with public school employers, ..." (Gov. Code, § 3540.) The scope of such representation is expressly confined to matters relating to "wages, hours of employment, and terms and conditions of employment." (Gov. Code, § 3543.2.) The act creates the PERB, an independent state agency empowered  inter alia  to hear and determine charges of unfair practices. (Gov. Code, §§ 3540.1, subd. (a), 3541-3541.3.)
Thus, while rejecting the advisory council's broad proposal intended to supercede existing legislation governing public employer-employee relations, the Legislature adopted the more limited design of the Rodda Act mandating collective bargaining in public school employment with respect to wages and working conditions. In pragmatic effect, it thereby struck a balance between the nonbinding "meet and confer" provisions of the Meyers-Milias-Brown Act applicable to city and county government *699 employment relations (see City and County of San Francisco v. Cooper, supra, 13 Cal.3d 898, 927) and the collective bargaining provisions of the later State Employer-Employee Relations Act which established the supremacy of collective bargaining agreements over conflicting state civil service provisions relating to the setting and adjustment of salary ranges. (See Gov. Code, §§ 3517.6 and 18850, as amended.) In light of such legislative developments, we next consider whether the relevant statutory language is in hopeless conflict or is otherwise capable of rational reconciliation.

Statutory Reconciliation
While both the Board and the PERB agree that the Legislature intended to achieve an accommodation between the merit system and collective bargaining statutory infrastructures under discussion, the accommodation desired is viewed from entirely different perspectives. The Board views the Rodda Act, together with contemporary amendments to the Education Code, as a legislative affirmation of the exclusive authority vested in the personnel commission in establishing the relationship of compensation schedules. Characterizing the Attorney General's interpretation of the final sentence of section 45268 as plainly erroneous, the Board contends that the effect of the amendment subordinating Commission rules on matters "subject to negotiation" (§ 45261, subd. (b)) was not intended to expand the limited "scope" of negotiations concerning wages (Gov. Code, § 3543.2) to include salary-setting functions within the exclusive purview of the statutory merit system, a conclusion fortified by the Legislature's failure to amend the controlling statute. We find such reasoning convoluted and unconvincing.
The PERB relies heavily upon the Attorney General's interpretation of section 45268 which recognizes the governing board's authority to adjust salary differentials between unequal positions within the same occupational group provided that the relative ranking of such positions as established by the personnel commission remains undisturbed. (1) Although such an official interpretation is not controlling, it is nevertheless entitled to great respect. (See Wenke v. Hitchcock (1972) 6 Cal.3d 746, 751-752 [100 Cal. Rptr. 290, 493 P.2d 1154]; Smith v. Anderson (1967) 67 Cal.2d 635, 641 [63 Cal. Rptr. 391, 433 P.2d 183]; Wallace v. Department of Motor Vehicles (1970) 12 Cal. App.3d 356, 362-363 [90 Cal. Rptr. 657].) And while the section itself makes no reference *700 to the concept of "occupational group" discussed in the opinion, it is clear that the process of classification is necessarily based upon identifiable job groupings reflecting a sufficient similarity of required skills, duties, knowledge and abilities. (Kaplan, The Law of Civil Service, p. 120; cf. Gov. Code, § 18523.)[12] Since the power to fix compensation for classified employees resides exclusively within the governing board (§§ 45160, 45267), the challenged construction provides opportunity for the meaningful exercise of such power which would neither "alter the relationship among classes as established by the classification plan" (rule 70.100.3) nor otherwise undermine the cardinal principle of "like pay for like service." (§ 45268.) Only the adjustment of salaries between classes within a given occupational group is affected; that permissible action cannot be said to necessarily disturb the relationship between salary schedules of other groups which remains within the classification prerogatives of the Commission.
(2) Moreover, the failure of the Legislature to amend the statute following publication of the Attorney General's opinion supports an inference that the legislative intent therein was correctly construed (see Cristmat, Inc. v. County of Los Angeles (1971) 15 Cal. App.3d 590, 595 [93 Cal. Rptr. 325]; People v. Union Oil Co. (1968) 268 Cal. App.2d 566, 571 [74 Cal. Rptr. 78]), particularly where accompanied by changes in related legislation as herein discussed. (See Carter v. Com. on Qualifications, etc. (1939) 14 Cal.2d 179 [93 P.2d 140]; Cal. State Employees Assn. v. Trustees of Cal. State Colleges (1965) 237 Cal. App.2d 530 [47 Cal. Rptr. 73]; Meyer v. Board of Trustees (1961) 195 Cal. App.2d 420, 432 [15 Cal. Rptr. 717].)
However, we believe  as did the trial court  that the subsequent amendment to section 45261 requiring Commission rules pertaining to negotiable subjects to conform to negotiated agreements, read in the light of the associated Rodda Act provisions (i.e., Gov. Code, §§ 3540 and 3543.2), removes any lingering uncertainty regarding legislative intention. Not only has the Legislature by clear implication included the subject matter of "compensation [or wages] within classification" (§ 45261, subd. (a))[13] within the "scope of representation," *701 (§ 3543.2) but it has also provided that Commission rules embracing that matter neither conflict nor be inconsistent with any agreement thus negotiated.
In arriving at a determination of legislative intention, we are guided by established principles of statutory construction. (3), (4) "A statute must be construed in light of the legislative purpose and design (People v. Grubb (1965) 63 Cal.2d 614, 620; ...). In enforcing command of a statute, both the policy expressed in its terms and object implicit in its history and background should be recognized. (Reimel v. Alcholic Bev. etc. App. Bd. (1968) 263 Cal. App.2d 706....) ... Consideration may also be given to other statutes in pari materia (County of Los Angeles v. Frisbie (1942) 19 Cal.2d 634, 639 ...)." (People v. Navarro (1972) 7 Cal.3d 248, 273 [102 Cal. Rptr. 137, 497 P.2d 481].) Under such familiar principles as summarized on an earlier occasion, we observed that "`... "[i]f possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." (Select Base Materials v. Board of Equal., supra, 51 Cal.2d 640, 645 [335 P.2d 672]); ... "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." (Johnstone v. Richardson (1951) 103 Cal. App.2d 41, 46 ...; see also West Pico Furniture Co. v. Pacific Finance Loans (1970) 2 Cal.3d 594, 608....) Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' (Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 ...; see also 45 Cal.Jur.2d, pp. 625-626 and cases there cited.)" (Killian v. City and County of San Francisco (1978) 77 Cal. App.3d 1, 8 [143 Cal. Rptr. 430], hg. den. Mar. 23, 1978.) And, ... "`[i]f it appears that the statutes were designed for different purposes, they are not irreconcilable, and may stand together.'" (Rudman v. Superior Court (1973) 36 Cal. App.3d 22, 27 [111 Cal. Rptr. 249].)
Applying those principles herein, there can be no rational doubt as to the meaning and purpose intended by the Legislature. (5) We construe the statutory intendment as manifesting a legislative policy that in *702 the areas of collective bargaining authorized under the provisions of the Rodda Act, those provisions prevail over conflicting enactments and rules and regulations of the public school merit or civil service system relating to the matter of wages or compensation of its classified service. Accordingly, we hold that the Board is under a duty to bargain in good faith with SCOPE concerning proposals related to the salaries or wages of the represented unit within the classified service. We further hold that no restriction is imposed upon the Board under the provisions of section 45268 in negotiating salary adjustments for individual job classifications within the same occupational group provided that the relationship between such individual positions as established by the Commission remains intact.[14]
In reaching that determination, we achieve harmony between the several parts of the whole statutory framework designed to accommodate separate but related legislative purposes. (See Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230 [110 Cal. Rptr. 144, 514 P.2d 1224].) Contrary to the Board's assertion, the conclusion we reach will not result in nullification of the necessary powers granted to the Commission in administering the merit system. The result of our holding merely accomplishes the intended and controlling purpose of the Legislature that the Board discharge its duty to bargain in good faith on the question of wages in the exercise of its fiscal power to fix compensation.[15] Correlatively, the Commission retains its exclusive power to regulate and administer the classified service consistent with the moral *703 imperatives of the merit system, including the residual power to recommend salary schedules for the Board's action and to consider any adjustments in salary obtained through collective bargaining in the establishment of appropriate classifications and salary schedule placements.
Judgment affirmed.
Elkington, J., and Newsom, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied April 30, 1980.
NOTES
[1] Except as otherwise indicated, all statutory references are to the reorganized (and renumbered) Education Code of 1976, as amended.
[2] The pleadings were amended pursuant to stipulation to reflect the change in name of the hearing board's expanded jurisdiction (Gov. Code, § 3540). Accordingly, we employ that same designation.
[3] The record discloses that except for the disputed salary issue, the parties successfully negotiated a memorandum of understanding which included a 5 percent "across-the-board" salary increase. While neither party raises an issue of mootness, we conclude that the novel questions presented are of such significant public interest as to require an adjudication on the merits. (See District Election etc. Committee v. O'Connor (1978) 78 Cal. App.3d 261, 265-266 [144 Cal. Rptr. 442]; Grasko v. Los Angeles City Board of Education (1973) 31 Cal. App.3d 290, 298-300 [107 Cal. Rptr. 334], disapproved on other grounds in City and County of San Francisco v. Cooper (1975) 13 Cal.3d 898, 917 [120 Cal. Rptr. 707, 534 P.2d 403].)
[4] The Board frames the issue as whether section 45268 confers exclusive jurisdiction upon the Commission concerning the relationship of compensation schedules and thus precludes such matter as an appropriate subject of negotiation. The PERB states the question conversely as whether that statute prevents the governing board from negotiating salaries for individual job classifications. SCOPE narrows the inquiry to whether wages paid to individual classified positions fall within the "scope of representation" authorized under Government Code section 3543.2.
[5] Under the rules and regulations adopted by the Commission in 1971, a salary schedule is defined as "[t]he complete list of ranges, steps, and rates established for the classified service." Salary range is defined as a series of consecutive salary steps or "locations" in the range comprising the pay rates for a class, while the term salary rate is used to describe the incremental unit of pay. (Rule 10.100.)
[6] Reference to three of the occupational groups included in the salary classifications considered below serves to graphically illustrate the opposing arguments:
[7] In general those positions and full-time employees requiring neither certification qualifications nor teaching credentials.
[8] Section 45268 provides as follows: "The commission shall recommend to the governing board salary schedules for the classified service. The governing board may approve, amend, or reject these recommendations. No amendment shall be adopted until the commission is first given a reasonable opportunity to make a written statement of the effect the amendments will have upon the principle of like pay for like service. No changes shall operate to disturb the relationship which compensation schedules bear to one another, as the relationship has been established in the classification made by the commission."
[9] In discussing the implications of relative placement of individual job classifications on salary schedules, the opinion recognizes that the twin factors of internal consistency and external competitiveness may often justify a salary increase for one occupational group and not another, ultimately reflected in the appropriate salary range assigned by the governing board. (Op. cit., supra, at pp. 83-85.)
[10] The 1977 amendment (Stats. 1977, ch. 1014, § 1, p. 3047) added subdivision (b) which provides: "With respect to those matters set forth in subdivision (a) which are a subject of negotiation under the provisions of Section 3543.2 of the Government Code, such rules as apply to each bargaining unit shall be in accordance with the negotiated agreement, if any, between the exclusive representative for that unit and the public school employer." (Italics added.)
[11] Enactment of the 1977 State Employer-Employee Relations Act (Gov. Code, §§ 3512-3524), implementing collective bargaining in the state civil service system, and the 1978 Higher Education Employer-Employee Relations Act (Gov. Code, §§ 3560-3599) pertaining to university and college employees, completed the legislative cycle.
[12] The Commission had adopted a substantially similar definition of a "class or classification" and it likewise defines related classes as a "group." (Rule 10.100.)
[13] We perceive no rational distinction between the term "compensation" used in section 45261, subdivision (a) and "wages" as employed in Government Code section 3543.2. In the field of labor-management relations, federal precedents have consistently provided an expanded definition of the term "wages" to include  inter alia  basic hourly rates of pay (N.L.R.B. v. Huttig Sash & Door Co. (1967) 377 F.2d 964) and shift differentials (Smith Cabinet Mfg. Co. (1964) 147 N.L.R.B. 1506). Such relevant precedents may be usefully consulted in construing similar state legislation. (See Agricultural Labor Relations Bd. v. Superior Court (1976) 16 Cal.3d 392 [128 Cal. Rptr. 183, 546 P.2d 687], app. dism., 429 U.S. 802 [50 L.Ed.2d 63, 97 S.Ct. 34].)
[14] Relying upon American Federation of State etc. Employees v. County of Los Angeles (1975) 49 Cal. App.3d 356 [122 Cal. Rptr. 591], the Board constructs a further argument by tracing the original language of the Winton Act precluding supersession of then existing provisions and the "rules and regulations of public school employers which establish ... a merit or civil service system" (former § 13080) into the successor provisions of the Rodda Act (Gov. Code, § 3540) as a legislative expression intended to subordinate the later enactment to prior existing merit systems. The reliance is misplaced. Not only is American Federation factually distinguishable [local ordinance and charter provisions preemption concerning job classification permitted under provisions of Meyers-Milias-Brown Act], but the court expressly declined to consider whether wages and working conditions within job classifications were appropriately negotiable. (Id., at p. 364; cf. Los Angeles County Civil Service Com. v. Superior Court (1978) 23 Cal.3d 55, 62-63 [151 Cal. Rptr. 547, 588 P.2d 249].) Moreover, unlike Government Code section 3500, the policy disclaimer provision of Government Code section 3540 is expressly conditioned upon an absence of conflict between merit system rules and regulations and lawful collective agreements.
[15] We emphasize that the narrow restriction imposed upon the Board under the statute sanctioning relative salary changes within an occupational group must nevertheless operate in such a manner as not to disturb the relationship in salary schedules as established between the remaining occupational groups. However, we need not and do not decide the nature and extent of changes which could possibly result in the proscribed disturbance. Given the practical realities of fiscal constraints and competitive economic factors within the labor market, such a possibility would appear more theoretical than real.