[No. B081963. Second Dist., Div. One. Aug. 4, 1995.]

WILLIAM C. SHOEMAKER, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

## COUNSEL

De Witt W. Clinton, County Counsel, Stephen R. Morris, Principal Deputy County Counsel, Joseph H. Duff, Hausman & Sosa, Jeffrey M. Hausman and Larry D. Stratton for Defendants and Appellants.

Rees Lloyd for Plaintiff and Respondent.

## OPINION

MASTERSON, J.—Plaintiff William C. Shoemaker, M.D., was removed from the administrative positions he held with the Charles R. Drew University of Medicine and Science (the University) and the Los Angeles County Martin Luther King, Jr./Drew Medical Center (the Medical Center). Upon Shoemaker's application, the trial court issued a mandatory preliminary injunction reinstating him to those positions pending trial. Defendants appeal from the order granting the injunction. We conclude that the court abused its discretion in issuing the injunction.

### BACKGROUND

The evidence before the trial court on Shoemaker's application for a preliminary injunction established the following.

The University is a California public benefit corporation that operates as a private institution of higher learning. Its board of directors has adopted bylaws giving the president of the University broad authority over academic and administrative affairs. The bylaws provide in part that the president "shall be responsible for all administrative areas" and "shall have full power of appointment, direction and supervision of the Faculty."

The University is affiliated with the Medical Center as a result of several contractual arrangements. The Medical Center, a county hospital, is operated by the County of Los Angeles through the department of health services.

The University has a department of emergency medicine, which conducts a residency training program at the Medical Center. As part of this program, residents from the University help staff the Medical Center's emergency medicine services department. The residency program receives academic accreditation through the Accreditation Council for Graduate Medical Education (the Accreditation Council or Council). Periodically, the academic, research, and clinical aspects of the residency program are reviewed during

a site visit by the Accreditation Council's Residency Review Committee (the Review Committee).[1]

Plaintiff Shoemaker was, and still is, a University faculty member, with an academic appointment as a professor of surgery. Further, he was, and still is, employed by Los Angeles County at the Medical Center as a civil service employee, classified as a physician specialist. His principal area of service at the Medical Center has been in the department of surgery, where he has distinguished himself as a trauma surgeon and critical care specialist.

In or about 1989, the University and the Medical Center commenced a search for someone to head their respective departments of emergency medicine. In soliciting job candidates, the Medical Center used a bulletin to describe its available position as follows: "The position involves a *dual* appointment by the Medical Center and the [University] as Chief of Emergency Medicine Services and Chairman of the Department of Emergency Medicine, respectively. As Chief of Emergency Medicine Services [at the Medical Center], the appointee will be responsible for organization and management of the Emergency Medicine Services Department and will report to the Medical Director of the medical center regarding clinical matters. . . . As Chairman of the [University's] Department of Emergency Medicine, the appointee will be responsible for academic and research activities pertaining to emergency medicine and will report to the Dean of the medical school." (Italics added.)

In January 1991, Shoemaker was appointed to fill the vacant administrative positions: he became the chairman of the University's department of emergency medicine and the chief of the Medical Center's emergency medicine services department.

In 1993, the Review Committee evaluated the University/Medical Center residency program in emergency medicine. By letter dated November 24, 1993, the Accreditation Council announced its intention to withdraw accreditation of the program, effective June 30, 1995. The Council gave program officials until January 4, 1994, to respond to the proposed loss of accreditation. If officials did not timely respond, the proposed loss of accreditation would become final. In explaining its position, the Council stated in part: "The leadership of the emergency department has inadequate qualifications by training, certification, and experience as an emergency medicine educator. The current Chairman of Emergency Medicine, Dr. Shoemaker, is a

---

[1]The Review Committee is composed of representatives of the American Board of Emergency Medicine, the American College of Emergency Physicians, and the American Medical Association Council on Medical Education.

board certified surgeon with limited emergency medicine practice experience. He is recognized as a researcher in surgery and critical care who belongs to no emergency medicine organizations and has very limited practice in the emergency department (12 clinical hours per week). His background, although excellent in his field, is not in emergency medicine and he does not practice as a career-dedicated emergency physician. The [Review Committee] cannot consider this individual equivalently qualified in emergency medicine. . . . This situation is unacceptable."

In a letter of December 17, 1993, the president of the University informed Shoemaker that he would be replaced as chairman of the University's department of emergency medicine: "On many occasions you have volunteered your willingness to step aside as Chairman of the Department of Emergency Medicine at [the University] if conditions warranted it. As I have discussed with you in recent private conversations, that time has now come. . . . I have determined that your tenure as Chairman will conclude on January 3, 1994. A search for a permanent director will ensue in short order." A similar letter, dated December 23, 1993, from the acting medical director (and approved by the director of health services) notified Shoemaker that effective January 3, 1994, he would no longer serve as chief of the Medical Center's emergency medicine services department.[2]

Although Shoemaker was removed from his administrative positions at the University and the Medical Center, he retained his status as a professor of surgery (with the University) and as a physician specialist (with the Medical Center). His compensation, benefits, classification, and grade at the Medical Center remained the same. His salary at the University decreased because he was no longer the chair of a department.

On January 14, 1994, in a memorandum addressed to all faculty and staff, the University president announced that "Range Hutson, M.D. has been appointed as the Interim Chairman, Department of Emergency Medicine, effective January 21, 1994. . . . The national search for a permanent chairman has begun and should be completed within the next six months. . . . [W]e want to express our appreciation for the many contributions that William Shoemaker, M.D. has made to the department and Medical Center."

On January 3, 1994, Shoemaker filed a verified complaint and an application for a temporary restraining order seeking to prevent his removal from his administrative positions. The court denied the restraining order and issued an order to show cause (OSC) why a preliminary injunction should

---

[2]Shoemaker claims he did not receive the Medical Center's December 23 letter until January 13, 1994.

not issue. The question framed by the OSC (as subsequently amended) was whether Shoemaker could be removed from his administrative posts without being accorded "the due process rights provided by constitutional and statutory law, and the Civil Service Rules of Los Angeles County."

Before the hearing on the preliminary injunction, Shoemaker applied a second time for a temporary restraining order, which the court denied. On January 21, 1994, Shoemaker filed a verified, first amended complaint alleging various causes of action against the University, its president, the County of Los Angeles, the department of health services, and its director.[3]

On January 31, 1994, the court granted plaintiff's application for a preliminary injunction, ordering defendants to: (1) refrain from removing Shoemaker as chairman of the University's department of emergency medicine and chief of the Medical Center's emergency medicine services department unless and until they provided him with due process and complied with civil service rules; (2) refrain from appointing a replacement for Shoemaker unless and until he was properly removed from his positions; and (3) rescind all orders removing Shoemaker from his administrative posts.

Defendants timely appealed from the order granting the injunction. Thereafter, we issued a writ of supersedeas staying enforcement of the preliminary injunction so as to preserve the status quo pending appeal. (Code Civ. Proc., § 923.)

## DISCUSSION

■ "The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court." (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121.) "A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' " (*Ibid.*) "Further, the burden rests with the party challenging the [trial court's ruling on the application for an] injunction to make a clear showing of an abuse of discretion." (*Ibid.*)

■ "[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the

---

[3]The first amended complaint alleged causes of action for violation of federal civil rights (42 U.S.C. §§ 1983, 1985(3), and 1986), defamation, breach of applicable bylaws and civil service rules, fraud, breach of the covenant of good faith and fair dealing, and infliction of emotional distress.

interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.)

An appeal from an order granting a preliminary injunction involves a limited review of these two factors—likelihood of success on the merits and interim harm. If the trial court abused its discretion on either factor, we must reverse. (*Carsten* v. *City of Del Mar* (1992) 8 Cal.App.4th 1642, 1649 [11 Cal.Rptr.2d 252].)

Where the evidence before the trial court was in conflict, we do not reweigh it or determine the credibility of witnesses on appeal. "[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts." (*Monogram Industries, Inc.* v. *Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 704 [134 Cal.Rptr. 714].) Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. (*Volpicelli* v. *Jared Sydney Torrance Memorial Hosp.* (1980) 109 Cal.App.3d 242, 247 [167 Cal.Rptr. 610].) Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. (*Ibid.*; *American Academy of Pediatrics* v. *Van de Kamp* (1989) 214 Cal.App.3d 831, 838 [263 Cal.Rptr. 46].)

"Where, as here, the preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion. 'The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts. A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal.' " (*Board of Supervisors* v. *McMahon* (1990) 219 Cal.App.3d 286, 295 [268 Cal.Rptr. 219], fn. omitted.) The granting of a mandatory injunction pending trial " 'is not permitted except in extreme cases where the right thereto is clearly established.' " (*Ibid.*, quoting *Hagen* v. *Beth* (1897) 118 Cal. 330, 331 [50 P. 425].)[4]

Finally, our decision does not constitute a final adjudication of the ultimate rights in controversy. (See *Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840]; *Wilkinson* v. *Times*

---

[4]The injunction in this case was undoubtedly mandatory in nature. It ordered defendants to take affirmative steps to restore Shoemaker to his administrative positions, and it altered the status quo because Shoemaker had already been removed from those positions when the trial court issued its order. (See 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, §§ 243-246, pp. 211-214 [discussing mandatory injunctions].)

*Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1039-1040 [264 Cal.Rptr. 194].) In reviewing the propriety of a ruling on an application for a preliminary injunction, we merely decide whether the trial court abused its discretion based on the record before it at the time of the ruling.

 Because Shoemaker is not likely to prevail on the causes of action supporting the injunction, and because the factor of interim harm favors defendants, we reverse the order granting the injunction.

## A. *Likelihood of Success on the Merits*

Shoemaker sought the preliminary injunction based on a violation of the *procedural* rights alleged in the first amended complaint. (See fn. 3, *ante.*) More specifically, Shoemaker argued that he should be reinstated until such time, if any, as defendants accord him the predisciplinary procedural safeguards allegedly mandated by civil service rules and the due process clause. We therefore have no occasion to evaluate Shoemaker's likelihood of success on his substantive claims.

### 1. *Civil Service Rules*

Given that Shoemaker was removed from two positions, we examine first whether his removal from the Medical Center post violated civil service rules. We then discuss whether those rules applied to his University position.

#### a. *Medical Center Position as Chief of Department*

As the chairman of a department at the Medical Center, Shoemaker was covered by the Professional Staff Association Bylaws (the PSA bylaws). At the time of his removal as chief of the emergency medicine services department, the PSA bylaws provided that "[e]ach department chairman shall serve a six-year term subject to all applicable County Civil Service rules and requirements." Because Shoemaker had been reappointed as chief (or chairman) of the department in January 1993, he had five years remaining in that post at the time of his removal in January 1994. Thus, the PSA bylaws permitted his removal only if the Medical Center complied with the Los Angeles County civil service rules.[5] Where, as here, a county has adopted a civil service ordinance, ". . . it must strictly follow established procedures to dismiss or demote a permanent employee." (*Birdsall* v. *Carrillo* (1991) 231 Cal.App.3d 1426, 1431 [282 Cal.Rptr. 504].)

---

[5]Those rules are codified in the Los Angeles County Code, title 5, appendix 1 (hereafter "civil service rules"). To refer to a specific civil service rule, we will preface the number of the rule with the word "Rule" (e.g., Rule 18.02(A)).

The civil service rules provide permanent employees with specified procedural safeguards in the event of contemplated disciplinary action. For instance, before an employee can be discharged or demoted, he must receive a written notice of the anticipated action and be informed of the particular grounds and facts therefor. (Rule 18.02(A).) He must then be allowed a reasonable time, not to exceed 10 days, within which to respond orally or in writing before the discharge or demotion becomes effective. (*Ibid.*) He may also request a hearing before the Los Angeles County Civil Service Commission, although the hearing need not be held before the discharge or demotion takes effect. (Rules 18.02(A), 18.02(B); see also Rule 4.)

In this case, Shoemaker contends that he was demoted without advance notice of the reasons therefor and without an opportunity to respond to the charges before the discipline took effect. The County of Los Angeles (the County) argues that Shoemaker's removal from his administrative post did not require the type of predisciplinary procedures mandated by civil service rules for a discharge or demotion. We agree with the County.

As chief of the emergency medicine services department, Shoemaker was entitled to predisciplinary protections if he was "discharged from county service or reduced in grade or compensation." (Rule 18.02(A).) Because Shoemaker was reassigned to his prior position at the Medical Center (i.e., physician specialist), he was not "discharged from county service." (See Rule 2.19 [defining "discharge" as a "separation from service for cause"].) Nor was he "reduced in grade or compensation." A "reduction" means "lowering" (Rule 2.49), and "grade" refers to "one standardized salary schedule, as defined in the Salary Ordinance of the County of Los Angeles" (Rule 2.27).[6] Here, the evidence established that Shoemaker's reassignment to his prior position as a physician specialist did not affect his compensation or grade with the County.[7] Accordingly, he was not entitled to the predisciplinary safeguards accorded employees who are discharged or demoted.

If anything, Shoemaker's removal as chief of a department and his simultaneous return to the position of a physician specialist appear to bring this case within the civil service rules governing reassignments or interdepartmental transfers. (See Rules 15.01, 15.02.)[8] In either situation, Shoemaker's rights are limited to a *post*transfer appeal: "An employee may appeal an

---

[6] A "demotion" is synonymous with a "reduction" in "grade." (Rule 2.17.)

[7] As stated, Shoemaker's compensation by the County (for his Medical Center job) was not affected by his change in positions. However, at the University, he lost the supplement paid to department chairs.

[8] As to reassignments, Rule 15.01 provides that "[t]he assignment of . . . an employee from one position to another, within the class and department for which the . . . employee has been certified by the director of personnel pursuant to these Rules, *is a matter of departmental*

assignment, interdepartmental transfer or change in classification to the director of personnel. . . . An appeal shall not authorize the employee to refuse the assignment, transfer or change in classification pending completion of the appeal process." (Rule 15.04.)[9]

In sum, neither the PSA bylaws nor the civil service rules required the County to accord Shoemaker any predisciplinary procedures before he was removed from his administrative post at the Medical Center.

### b. *University Position as Chairman of Department*

Shoemaker's reassignment at the Medical Center did not result in any loss of compensation or benefits from the County, but his removal as chairman of the University's department of emergency medicine did adversely affect his University salary. (See fn. 7, *ante*.) Obviously, if civil service rules applied to the University or if Shoemaker's administrative posts at the Medical Center and the University were treated as one position under the civil service system, he would have a compelling argument that defendants failed to accord him the predisciplinary safeguards due a civil servant.[10] The trial court was apparently of the view that the two posts constituted a single position for civil service purposes; the court commented that "[p]laintiff's position is a dual position and defendants cannot fractionalize the status of the position."

We do not question that Shoemaker had a "dual appointment" to the respective emergency medical departments of the University and the Medical Center. We also understand that one person typically occupies both positions.[11] That does not lead to the conclusion, however, that the University was subject to civil service rules or that Shoemaker's dual appointment brought his University position within the reach of the civil service system.

Inherent in the concept of a "dual" appointment is the existence of *two* appointing powers—here, the Medical Center (operated by the County) and

---

*administration . . . .*" (Italics added.) Regarding transfers, Rule 15.02 states in pertinent part that, "at the request of the appointing power of the receiving department, an interdepartmental transfer *shall* be authorized." (Italics added.)

[9]The Los Angeles County Board of Supervisors has designated the chief administrative officer to be the director of personnel.

[10]Under this analysis, Shoemaker's decrease in pay at the University would mean he suffered a "reduction in grade or compensation" within the meaning of the civil service rules, thereby entitling him to advance notice of the reasons for the reduction and an opportunity to respond to the charges before being removed from his position. (See Rule 18.02(A).)

[11]According to the University, there are other medical schools in the area that share some of their personnel with a particular hospital (e.g., the University of Southern California and Los Angeles County General/USC Medical Center, the University of California at Los Angeles and Los Angeles County Harbor/UCLA Medical Center).

the University. Shoemaker has not established that the Medical Center and the University disregarded each other's separateness with respect to his administrative positions. Indeed, the PSA bylaws expressly stated that Shoemaker's administrative position at the Medical Center "does not reflect an academic appointment by the medical school but an appointment to a County Civil Service position which can only be made by the Director of Health Services who is the appointing power." Moreover, Shoemaker cites nothing in the record indicating that the two institutions were *required* to appoint or retain the same person to head their respective departments. That they did so in this case does not mean Shoemaker had only one employer (i.e., the County) or that he held a single position (i.e., one covered by civil service rules).

Consistent with the concept of a dual appointment, Shoemaker was removed from each position by the appropriate "appointing power": the University president removed him from the academic post by letter of December 17, 1993, and the director of health services removed him from the Medical Center post by letter of December 23, 1993.

Further, we cannot ignore the adverse consequences to the University were we to conclude that civil service rules govern the removal of persons who chair its academic departments. The University bylaws vest such decisions in the president, not a civil service commission. The University's board of directors has determined that department chairs should serve at the pleasure of the president. Civil service rules, in contrast, generally require "good cause" for any punitive employment decisions. We believe that the University should be able to apply its bylaws in pursuing its educational mission absent substantial evidence that civil service rules apply. No such evidence was presented here.

Nor are we blind to the fact that the University is a *private* educational institution. Civil service rules, on the other hand, govern the *public* sector. (See *Steen* v. *Board of Civil Service Commrs.* (1945) 26 Cal.2d 716, 722 [160 P.2d 816] [discussing purpose of civil service system]; *Sonoma County Bd. of Education* v. *Public Employment Relations Bd.* (1980) 102 Cal.App.3d 689, 694 [163 Cal.Rptr. 464] [discussing history of civil service system]; Rule 1.02 [discussing purpose of civil service rules].) We need not debate the advantages or disadvantages of private versus public employment. Suffice it to say that on the record before us, we see no basis for requiring a private university to dispense with its own personnel rules in favor of those applicable to government employment.

2. *Due Process*

Shoemaker contends that, before being removed from his administrative posts, he was entitled to procedural safeguards under the due process

clause and the California Supreme Court decision in *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774] (hereafter *Skelly*).[12] Given that the civil service rules were drafted with the due process clause and *Skelly* in mind (*Department of Health Services* v. *Civil Service Com.* (1993) 17 Cal.App.4th 487, 498 [21 Cal.Rptr.2d 428]), it is not surprising that Shoemaker's due process claim meets the same fate as his civil service claim.

In *Skelly*, our Supreme Court held that under the state and federal due process clauses, permanent civil service employees are entitled to procedural protections before they are discharged from employment. As the court stated: "It is clear that due process does not require the state to provide the employee with a full trial-type evidentiary hearing prior to the initial taking of punitive action. However, . . . due process does mandate that the employee be accorded certain procedural rights before the discipline becomes effective. As a minimum, these preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing the discipline." (15 Cal.3d at p. 215.)

As *Skelly* noted, ". . . when a person has a legally enforceable right to receive a government benefit provided certain facts exist, this right constitutes a property interest protected by due process." (15 Cal.3d at p. 207.) " 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . [¶] Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " (*Id.* at p. 207, quoting *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 560-561, 92 S.Ct. 2701].) "The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " (*Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422, 430 [71 L.Ed.2d 265, 274, 102 S.Ct. 1148].)

Applying a property rights analysis to the facts before it, *Skelly* held that an employee must have a " 'legitimate claim of entitlement to continued

---

[12]Shoemaker does not indicate whether he is relying on the state or federal due process clause (Cal. Const., art. I, § 7, subd. (a); U.S. Const., Amend. XIV). Since both clauses have the same scope in this case (*Sandrini Brothers* v. *Voss* (1992) 7 Cal.App.4th 1398, 1405, fn. 2 [9 Cal.Rptr.2d 763]; *Schultz* v. *Regents of University of California* (1984) 160 Cal.App.3d 768, 780-787 [206 Cal.Rptr. 910]), we rely on decisions construing either provision.

employment absent 'sufficient cause' [for termination]'" before the due process clause mandates predisciplinary safeguards. (15 Cal.3d at p. 207, quoting *Perry* v. *Sindermann* (1972) 408 U.S. 593, 602-603 [33 L.Ed.2d 570, 580-581, 92 S.Ct. 2694].) Because the State Civil Service Act required "cause" to discharge or discipline a permanent employee, *Skelly* concluded that ". . . the state must comply with procedural due process requirements before it may deprive its permanent employee of this property interest by punitive action." (15 Cal.3d at p. 208.)[13]

While *Skelly*'s requirement of predisciplinary safeguards has been extended to demotions (*Ng* v. *State Personnel Bd.* (1977) 68 Cal.App.3d 600, 606 [137 Cal.Rptr. 387]), it does not apply to short-term suspensions (*Civil Service Assn.* v. *City and County of San Francisco* (1978) 22 Cal.3d 552, 558-564 [150 Cal.Rptr. 129, 586 P.2d 162]), reclassifications (*Schultz* v. *Regents of University of California, supra,* 160 Cal.App.3d 768, 775-787), or reprimands (*Stanton* v. *City of West Sacramento* (1991) 226 Cal.App.3d 1438, 1441-1442 [277 Cal.Rptr. 478]).

In deciding whether a particular employment action requires predisciplinary procedural safeguards under the due process clause, a court must first determine whether the employer's conduct adversely affects a property right. (*Skelly,* 15 Cal.3d at pp. 206-207.) If a property right has been infringed, the court should then consider, among other things, the effect of the action on the employee. (*Id.* at pp. 212-214.)[14]

In this case, we must resolve a preliminary issue before addressing whether Shoemaker had a property interest in his administrative positions. Specifically, in light of the public and private aspects of Shoemaker's employment, we must decide which conduct on defendants' part is subject to due process constraints. It is well established that "[o]nly those actions that may fairly be attributed to the state . . . are subject to due process protections." (*Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1112 [278 Cal.Rptr. 346, 805 P.2d 300]; accord, *Laird* v. *Workers' Comp. Appeals Bd.* (1983) 147 Cal.App.3d 198, 202 [195 Cal.Rptr. 44].)

---

[13]Although the parties dispute whether Shoemaker had a *property* right in his administrative positions, Shoemaker does not argue that a *liberty* interest required predisciplinary procedures. (Cf. *Board of Regents* v. *Roth, supra,* 408 U.S. at pp. 572-575 [33 L.Ed.2d at pp. 559-560] [discussing liberty interests that invoke procedural due process].) Accordingly, we limit our discussion to property rights.

[14]In terminations and demotions, for example, an employee suffers a loss in pay or benefits. (*Stanton* v. *City of West Sacramento, supra,* 226 Cal.App.3d at p. 1442.) Where less severe discipline is involved (e.g., short-term suspension, reprimand), an employee "does not face the bleak prospect of being without a job and the need to seek other employment hindered by the charges against him." (*Civil Service Assn.* v. *City and County of San Francisco, supra,* 22 Cal.3d at p. 563.)

While the County's removal of Shoemaker from his Medical Center position satisfies the requirement of "state action" (see *Edelman v. Jordan* (1974) 415 U.S. 651, 667, fn. 12 [39 L.Ed.2d 662, 675, 94 S.Ct. 1347]), the loss of his University position does not. The University is a private institution; Shoemaker's position there was not governmental; and he was removed by the University president, not a public official or employee. Further, to the extent the University's action was motivated by accreditation concerns, Shoemaker does not argue that the Accreditation Council is a public or governmental entity. His due process claim therefore rests solely on the conduct of the County in removing him from the Medical Center post.

We conclude that the County did not infringe any property right when it removed Shoemaker from one position (chief of the department of emergency medicine services) and reassigned or transferred him to his prior position (physician specialist). Shoemaker points to no statute, rule, or mutual understanding supporting a legitimate claim of entitlement to a *specific* position at the Medical Center. (See *Leis v. Flynt* (1979) 439 U.S. 438, 442 [58 L.Ed.2d 717, 721-722, 99 S.Ct. 698] [under due process clause, claim of entitlement must be derived from statute, rule, or through mutual understanding].)

The civil service rules may have created a legitimate expectation that, absent good cause, the County would not terminate Shoemaker's employment altogether or impose other disciplinary measures (e.g., demotion) that would adversely affect his compensation. (See Rules 18.02(A), 18.031.) But Shoemaker was not terminated from government service or otherwise disciplined. Rather, he was reassigned or transferred. In this situation, the civil service rules make clear that he had no legitimate expectation of remaining in a particular position; the County retained the discretion to reassign or transfer employees without cause. (See Rules 15.01, 15.02; fn. 8, *ante*.)[15]

We find persuasive the federal cases recognizing that in these circumstances: "[t]he analogy to the job termination context is not determinative. Transfers and reassignments have generally not been held to implicate a property interest." (*Maples v. Martin* (11th Cir. 1988) 858 F.2d 1546, 1550 [transfer of tenured professors from one department to another in response to accreditation review did not implicate a property right]; accord, *Pietri Bonilla v. Alvarado* (D.P.R. 1991) 762 F.Supp. 451, 461 [employee had no

---

[15]Assuming arguendo that the specific civil service rules governing reassignments and interdepartmental transfers did not apply to Shoemaker's situation, then the rules as a whole are completely silent on the type of personnel action taken by the County. Plainly, such silence did not permit Shoemaker to reasonably expect that he would remain in his administrative post absent good cause for removal.

cognizable interest in continued employment as an administrator rather than an adviser]; *Farkas* v. *Ross-Lee* (W.D.Mich. 1989) 727 F.Supp. 1098, 1104-1105 [stating that court "is not convinced that an interdepartmental transfer implicates a constitutionally protected property interest"], affd. (6th Cir. 1989) 891 F.2d 290; *Mahaffey* v. *Kansas Bd. of Regents* (D.Kan. 1983) 562 F.Supp. 887, 889 [rejecting plaintiff's argument that he had a protected property interest in his administrative positions].)

Because Shoemaker's reassignment or transfer from chief of the emergency medicine services department to physician specialist did not implicate a property right, the due process clause did not require any predisciplinary procedural safeguards.[16]

## B. *Interim Harm*

 In evaluating interim harm, the trial court compares the injury to the plaintiff in the absence of an injunction to the injury the defendant is likely to suffer if an injunction is issued. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.)

 Without an injunction, Shoemaker's compensation, benefits, classification, and grade at the Medical Center will remain the same as before his alleged demotion. His salary at the University will decrease, although we are not told by how much.[17] He will no longer be the head of a department at either institution, but he will retain the positions he held before accepting the administrative posts. We credit Shoemaker's evidence that his reputation will be harmed to some extent by defendants' conduct. However, at the time of the hearing on the injunction, Shoemaker was pursuing the first step of a three-step grievance process in which he was seeking immediate reinstatement to his administrative positions. Further, as stated, he could appeal the Medical Center's action to the Los Angeles County Director of Personnel.

---

[16]Given our conclusion that Shoemaker did not have a property interest in avoiding a change in positions, we need not decide what process was due. (See *Skelly,* 15 Cal.3d at pp. 208-215.) That inquiry would require us to balance the government's interest in expeditious removal of an employee against the employee's interest in continued employment. (*Id.* at pp. 212-213.)

[17]We note that Shoemaker's brief failed to respond to several of the points raised in defendants' opening briefs. (See *Cox Cable San Diego, Inc.* v. *City of San Diego* (1987) 188 Cal.App.3d 952, 968 [233 Cal.Rptr. 735] ["If an argument is not presented, it will not be considered."].) He chose instead to discuss evidence that was not before the trial court at the time he sought the injunction. We denied his motion to take judicial notice of that evidence, which had the effect of rendering most of his brief irrelevant to the appeal. (See *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764] [an appellate court generally "will consider only matters which were part of the record at the time the judgment was entered"].)

Both of these remedial schemes provided Shoemaker with a means to "clear his name" short of invoking the injunctive power of the court.

Moreover, the Medical Center and the University stand to lose much more from the issuance of an injunction than Shoemaker would suffer from its denial. By reinstating Shoemaker to his administrative posts, the injunction will jeopardize the accreditation of the residency program in emergency medicine. The Accreditation Council made clear in its November 24, 1993, letter that it was "unacceptable" for Shoemaker to serve as chair of the department of emergency medicine. The Council gave program officials approximately five weeks to respond to the proposed loss of accreditation. Without a timely, acceptable response, the program would lose its accreditation effective June 30, 1995. The University and the Medical Center removed Shoemaker from his administrative posts before the deadline for responding to the Council.

In opposing Shoemaker's application for a preliminary injunction, defendants established that the residency program was a significant part of the Medical Center's mission and that its academic accreditation was of crucial importance to the health and well-being of the community. The Medical Center's director of human resources concluded that "the loss of accreditation of the Department of Emergency Medicine's residency training program would be catastrophic."

Comparing the relative hardships of the parties, we conclude that the factor of interim harm strongly counsels against an injunction. Without injunctive relief, Shoemaker will remain employed by both institutions, and he can pursue reinstatement through two different administrative routes. However, if an injunction is issued, the residency program will be put in jeopardy, and the health of the community put at risk. The injury facing Shoemaker in the absence of an injunction pales in comparison to the injury that the injunction would impose on defendants and the public.

Accordingly, the trial court abused its discretion in issuing the injunction.

### DISPOSITION

The order granting the preliminary injunction is reversed. Defendants are entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied August 31, 1995, and respondent's petition for review by the Supreme Court was denied November 16, 1995.