[No. C059375. Third Dist. Mar. 8, 2010.]

THE PEOPLE ex rel. JEFF W. REISIG, as District Attorney, etc., Plaintiff and Respondent, v.
TIMOTHY ACUNA et al., Defendants and Appellants.

COUNSEL

Law Office of Mark E. Merin, Mark E. Merin, Joshua Kaizuka and Cathleen A. Williams for Defendants and Appellants.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HULL, J.—Plaintiff, the District Attorney of Yolo County, initiated this action against the Broderick Boys, an alleged criminal street gang, and 23 of its members to enjoin as a public nuisance their activities in a 2.98-square-mile area of the City of West Sacramento. The trial court granted plaintiff's motion for a preliminary injunction and defendants appeal. We conclude sufficient, credible evidence supports the trial court's conclusion the Broderick

Boys is a criminal street gang whose activities have created a public nuisance in the designated area. However, we further conclude two provisions of the preliminary injunction, one dealing with controlled substances and the other dealing with the consumption of alcoholic beverages, are unenforceable. We therefore reverse as to those provisions but otherwise affirm the order.

### FACTS AND PROCEEDINGS

Plaintiff filed the original complaint in this action on December 30, 2004, against the Broderick Boys and Does 1 through 400 and obtained a preliminary injunction by default. Later, plaintiff dismissed the Doe defendants and obtained a permanent injunction against the Broderick Boys alone, also by default. Several individuals moved to set aside the judgment, but the trial court denied the motion. On appeal to this court, we concluded plaintiff failed to provide adequate notice of the action and reversed the order denying the motion to set aside the default judgment. (See *People ex rel. Reisig v. Broderick Boys* (2007) 149 Cal.App.4th 1506, 1512–1516, 1528–1529 [59 Cal.Rptr.3d 64].)

On remand, plaintiff filed a first amended complaint naming as defendant the "Broderick Boys aka BRK aka BSK aka Norteno aka Norte aka XIV" (hereafter the Broderick Boys) as well as 23 named individuals and Does 1 through 400. The named defendants are Timothy Acuna (Cartoon), Thomas Cedillo, Robert Cortez, Victor Dazo, Jr. (Little Vic), Alex Estrada (Otter), Ramon Esquilin (Kiko), Victor Ferreira (Hugo), Jesse Garcia (Smokey), Michael Hernandez (Snoopy), Rainey Martinez, William McFadden (Billy), Robert Montoya (Little Rob), Michael Morales, Rudy Ornelas, Guillermo Duke Rosales (Duke), Robert Sanchez (Rabbit), Paul Savala (Savage), Rudy Tafoya (Rude Dog), Abel Trevino (Gangster), Felipe Valadez, Jr. (Shug), Billy Wolfington (Bouncer), Tyson Ybarra, and William Ybarra, Jr. (Shylos).

The first amended complaint contains a single cause of action alleging a public nuisance in an area described as follows: "located in the City of West Sacramento, bounded by Harbor Boulevard to the West, the Sacramento River to the North and to the East (but not including the area previously known as the Lighthouse Marina and Golf Course) and by Highway 50/Business Loop 80 and State Route 275 to the South" (the Safety Zone).

On July 27, 2007, plaintiff moved for a preliminary injunction, supported by copies of the criminal records of the named defendants and the declarations of 48 police officers, including that of Investigator Villanueva, a gang expert. These declarations described various contacts between the officers and

alleged members of the Broderick Boys, indicia of gang membership, graffiti found in the Safety Zone, and crimes committed by alleged gang members in the Safety Zone.

Villanueva opined the Broderick Boys gang "is the largest and most powerful criminal street gang in the City of West Sacramento," has been involved in crimes and other nuisance activities since the late 1980's, is a mixed-race gang primarily composed of Hispanics and Caucasians, and is connected to the Nuestra Familia prison gang. According to Villanueva, the Broderick Boys has a hierarchical structure, with younger men and women as "street soldiers" or "foot soldiers," those from 18 years old to their mid-20's as the "older homies," those 25 to over 30 years old as the "veteranos" who are seldom seen on the street but control things from the shadows, and those who make the major decisions are called "shot callers."

Villanueva further described how the Broderick Boys use graffiti, tattoos and gang signs to intimidate others and to mark their territory. He explained the crimes typically committed by the Broderick Boys and how those crimes are used to support the gang's activities and to instill fear among the residents of West Sacramento. According to Villanueva, the Broderick Boys use fear and intimidation to keep residents from reporting crimes.

In opposition to plaintiff's motion, defendants presented their own declarations from approximately 100 residents and others familiar with the Safety Zone. Most of these declarants indicated they had not seen gang activity in the Safety Zone and did not believe there was a gang problem requiring an injunction. Two declarants indicated they have not seen any groups of gang members patrolling the streets in the Safety Zone, and others expressed the belief that the only ones engaging in harassment in the area are the police.

Defendants also submitted the declaration of their own gang expert, Professor James Hernandez of California State University, Sacramento, who opined the name "Broderick Boys" does not identify a criminal street gang. Rather, it is a designation used by some people to indicate their geographic home, i.e., the Broderick area of West Sacramento. According to Professor Hernandez, there is no leadership structure, defined goals, or organized efforts by the purported members of the Broderick Boys, as would be expected in a criminal street gang. Professor Hernandez further indicated the crime rate in West Sacramento is no greater than in any other city of its size and demographics.

The trial court issued the preliminary injunction. In its order granting plaintiff's motion, the court indicated that plaintiff met his burden of proving he is likely to prevail on the merits of his public nuisance claim and that any

harm caused by continuation of the nuisance is not outweighed by the effects on defendants of granting the temporary injunction. In particular, the court found: "[T]he Broderick Boys, through its members including the defendants named in the amended preliminary injunction, acting individually or collectively, have engaged in violent assaults; robberies; 'tagging' of private and public property with gang graffiti; intimidation; threats against victims and witnesses; trespass; theft; and possession, possession for sale and transportation of illegal drugs in the Safety Zone. To announce their presence in and enforce their turf and to instill fear [in] persons in the community and rival gang members, Broderick Boys members 'patrol'; 'tag'; congregate in areas in public view and display their tattoos, colors and signals; commit brazen crimes, sometimes announcing their gang affiliation while perpetrating such crimes; challenge passers by; and threaten violence and retaliate against individuals for perceived acts of disrespect, all within the Safety Zone. Searches of Broderick Boys members in the Safety Zone have yielded weapons including guns, crowbars, bats, knives and even an ice pick engraved with the gang's symbols. Many serious crimes involving the Broderick Boys occur after 10:00 p.m. and before sunrise."

The court issued a preliminary injunction prohibiting various activities within the Safety Zone by the Broderick Boys and its "active members," including the named defendants. Defendants appeal.

Discussion

I

*Introduction*

Defendants challenge the trial court's findings, both express and implied, underlying the preliminary injunction. They argue there was insufficient evidence a gang named the Broderick Boys exists in West Sacramento or that the alleged gang or its members create a public nuisance within the Safety Zone. They further contend the trial court erred in concluding there is a greater risk of harm from denying the temporary injunction than granting it. Finally, defendants contend various provisions of the injunction are vague, overbroad or otherwise violate their constitutional rights.

As our state Supreme Court explained in *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090 [60 Cal.Rptr.2d 277, 929 P.2d 596] (*Acuna*): "At this initial stage in the proceeding, the scope of our inquiry is narrow. We review an order granting a preliminary injunction under an abuse of discretion standard. [Citations.] Review is confined, in other words, to a consideration whether the trial court abused its discretion in ' "evaluat[ing] two interrelated

factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued." ' [Citation.] And although we will not ordinarily disturb the trial court's ruling absent a showing of abuse, an order granting or denying interlocutory relief reflects nothing more than the superior court's evaluation of the controversy on the record before it *at the time* of its ruling; it is not an adjudication of the ultimate merits of the dispute." (*Id.* at p. 1109.)

■ Defendants argue that in evaluating the two factors, we must apply a clear and convincing evidence standard. In other words, we must decide whether the trial court abused its discretion in concluding plaintiff established by clear and convincing evidence he is likely to prevail on the merits and that the balance of potential harms is in his favor. In *People v. Englebrecht* (2001) 88 Cal.App.4th 1236 [106 Cal.Rptr.2d 738] (*Englebrecht*), the Court of Appeal concluded the importance of the interests affected by a gang injunction "requires that the finding of facts necessary to justify its issuance be proved by clear and convincing evidence." (*Id.* at p. 1256.)

Plaintiff contends *Englebrecht* involved a *permanent* injunction rather than a preliminary injunction and argues defendants "cite no authority for the proposition that in the context of a preliminary injunction the superior court must apply the clear and convincing standard." However, it is plaintiff who fails to cite authority for the proposition that different standards apply to preliminary and permanent injunctions. In either case, the interests involved are the same; only the duration is different. A point not argued or supported by citation to authority is forfeited. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

■ Defendants further argue the clear and convincing evidence standard requires evidence "that is 'so clear as to leave no substantial doubt' and 'sufficiently strong to command the unhesitating [assent] of every reasonable mind.' " Defendants cite as support *Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079 [77 Cal.Rptr.2d 408, 959 P.2d 715] and *In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr. 637, 623 P.2d 198]. In those cases, the state high court indicated the applicable standard is something less than proof beyond a reasonable doubt. It is satisfied where the evidence establishes a "high probability" of the requisite findings. (*Broadman, supra,* 18 Cal.4th at p. 1090; see also *In re Angelia P., supra,* 28 Cal.3d at p. 919.) Thus, our task is to determine if the trial court abused its discretion in concluding the evidence established a high probability (1) plaintiff will prevail on the merits, and (2) the interim harm plaintiff is likely to sustain if

the preliminary injunction is denied is not exceeded by the interim harm defendants are likely to suffer if the injunction is issued.

## II

### *Criminal Street Gang*

Defendants contend plaintiff failed to prove there is a criminal street gang named the Broderick Boys operating in West Sacramento. They argue plaintiff relied on general police declarations regarding gang customs and clothing and self-identification by alleged gang members without ever proving a gang exists in the first place. They further argue plaintiff failed to present any evidence to establish "how many members were in the purported gang, what the bylaws of the gang were, identification of individuals describing their rank or position, *no evidence of collaborative activities or collective organizational structure.*" According to defendants, plaintiff relied solely on the unsubstantiated opinion of his gang expert, who merely inferred collective action from the fact the alleged gang has more than three members. Defendants assert this opinion was refuted by their gang expert, who opined the name "Broderick Boys" means nothing more than that people claiming this moniker are proclaiming where they live, i.e., the Broderick area of West Sacramento. Finally, defendants contend plaintiff failed to demonstrate any of the named defendants are members of the purported gang.

Under the Penal Code, a "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated criminal offenses], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).) " '[P]attern of criminal gang activity' " is defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (*Id.*, § 186.22, subd. (e).) The covered offenses include assaults, robberies, grand theft and felony vandalism. (*Ibid.*)

In order to prove the existence of a criminal street gang in a given case, it is of course necessary to concentrate on the activities of those alleged to be members. A criminal street gang can act only through its members. (*Acuna, supra,* 14 Cal.4th at p. 1125.) In *Englebrecht,* the Court of Appeal

explained that, in the context of a gang injunction, it is not necessary to prove the commission of criminal acts. Rather, in order to enforce a gang injunction against an alleged member, it must be shown the person "participates in or acts in concert with an ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of acts constituting the enjoined public nuisance, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the acts constituting the enjoined public nuisance. The participation or acting in concert must be more than nominal, passive, inactive or purely technical." (*Englebrecht, supra*, 88 Cal.App.4th at p. 1261.)

Defendants argue there was insufficient evidence to prove the existence of a criminal street gang, because plaintiff failed to prove both collaborative activities by alleged gang members and a collective organization structure. They cite as support *People v. Williams* (2008) 167 Cal.App.4th 983 [86 Cal.Rptr.3d 130] (*Williams*). In *Williams*, the defendant was convicted of murder and active participation in a criminal street gang named the "Small Town Peckerwoods," which was alleged to be part of a larger "Peckerwoods" gang. On appeal, the defendant argued, among other things, there was insufficient evidence to support the gang charge. In particular, the defendant argued the relevant group to consider was the local gang, the Small Town Peckerwoods, not the larger group, and there was insufficient evidence regarding the activities of the smaller group to support the conviction. (*Id.* at pp. 985, 987.)

The Court of Appeal agreed and reversed the gang conviction. In the context of "the relationship that must exist before a smaller group can be considered part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang" (*Williams, supra*, 167 Cal.App.4th at p. 985), the court said: "[S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Id.* at p. 988.) The court concluded no such showing had been made in that case. (*Ibid.*)

Defendants' reliance on *Williams* is misplaced. Besides the fact that *Williams* was a criminal prosecution involving a higher standard of proof, the issue there was not what is required to prove a particular group is a criminal street gang. In *Williams*, the issue was whether, in proving a crime was committed for the benefit of a criminal street gang, the People are limited to evidence

regarding activities of the local gang or may rely on the activities of a larger group of which the local gang is a part. The court indicated the latter is permissible only if the People establish collaborative activities and a collective organizational structure between the local gang and the larger gang.

In the present matter, plaintiff did not try to prove the Broderick Boys is a criminal street gang by using evidence regarding the activities of the larger Norteno gang. As we describe below, plaintiff relied solely on evidence relating to the local gang.

Plaintiff's gang expert, Investigator Villanueva, opined the Broderick Boys "is the largest and most powerful criminal street gang in the City of West Sacramento. It has consistently grown and been involved in criminal enterprise (i.e., murders, felonious assaults, shootings, stabbings, robberies, thefts, narcotic activity and vandalism) and other nuisance activity since the late 1980's." Villanueva further opined the Broderick Boys gang "is connected to the Nuestra Familia gang which is a powerful prison gang in California."

Defendants argue Investigator Villanueva provided no evidence to support his opinion that the Broderick Boys is the most powerful gang in West Sacramento or that it is connected to the Nuestra Familia gang. But for purposes of the present proceeding, it does not matter if the Broderick Boys is the most powerful gang in West Sacramento or is connected with the Nuestra Familia gang. What matters is whether the activities of the Broderick Boys gang, standing alone and regardless of its relative size, constitute a public nuisance in the Safety Zone of West Sacramento. We shall consider that issue in the next section.

Regarding the criminal street gang status of the Broderick Boys, Investigator Villanueva stated: "I've seen the Broderick Boys criminal street gang use some common signs, symbols and colors to identify themselves. As far as hand signs, they will display the letter B, (for Broderick Boys or Broderick)[,] by forming the shape of an uppercase or lower case B with their fingers. They will also display the number four or fourteen with their hands by holding up four fingers on one hand and/or 1 finger on the other hand. They will also display the letter N with their fingers to represent Norte. I have also seen them display the number 14 on clothing, signs, jewelry and other items. This is significant because the 14th letter of the alphabet is the letter 'N' which corresponds to Norte or Norteno which is simply another way the Broderick Boys identify themselves. Norte, Norteno or simply N refers to a Northern Hispanic gang, in their case the Broderick Boys. They will also use roman numerals I and IV or XIV, to display their allegiance. The color red is the common color of the Broderick Boys criminal street gang. They will display the color red in graffiti, clothing, hats, belts, shoes and practically

every accessory imaginable. The purpose of displaying these common signs, symbols and colors is for Broderick Boys gang members to 'represent,' i.e., show their allegiance to the gang, put other gang members and members of the community on notice when they are seen in public. From my hundreds of contacts and discussions with Broderick Boy gang members I know that the 'notice' they intend to convey to others by displaying these signs, symbols and colors is 'We are Broderick Boys, fear us, this is our turf, don't get in our way, don't disrespect us, don't report our crimes or you will pay.' "

Villanueva opined the crimes Broderick Boys members primarily commit are assaults, robberies, felony vandalism, narcotics offenses, witness intimidation and vehicle thefts. Villanueva based this opinion on his "investigation of hundreds of crimes committed by Broderick Boy gang members . . . as well as [his] discussions with Broderick Boy gang members where they have explained to [him] the reasons for the violent assaults which includes, defeating and disrespecting rival gang members, intimidating members of the community and securing turf for their gang operations, including illicit drug trade." He also based his opinion on his "review of hundreds of police reports over the last several years involving crimes committed by Broderick Boy gang members in the Safety Zone" and his "review of the declarations of other officers which were prepared in support of the proposed injunction."

Villanueva explained that Broderick Boys gang members use assaults to maintain control of their turf. They "will beat, stab or shoot rival gang members or members of the community who disrespect them or simply cross their path. As to rivals, it keeps them from invading the Broderick Boy[s] turf. It not only keeps the Broderick Boys safe in their homes, but it secures the territory for Broderick Boy[s] crimes like narcotics sales. As to innocent members of the community, the assaults instill fear into the public. People who live in Broderick Boy[s] territory know that if they cross the Broderick Boys, or if they call the police on the Broderick Boys that they may be violently assaulted. It keeps them quiet."

Investigator Villanueva described the organizational structure of the Broderick Boys as follows: "Broderick Boys is a traditional type of Hispanic based gang starting from the street soldiers. Usually it's the younger men and women you're going to see. They are known as the street soldiers, the foot soldiers, the ones that are posting up on the corner, standing there, throwing their signs at anybody that passes by, demonstrating to the world that this is their turf. Then you've got some of your older guys, and by older in the gang, you're looking at 18 up to mid 20's, maybe they've done some time in the Youth Authority, jail or prison. They've gotten out and they've developed some type of recognition through the crimes that they've committed or the names they made for themselves. The gang starts to refer to these guys as the

older homies. Then past them you've got the guys that are 25 to 30-plus years old and those are considered the veteranos, which is Spanish for the older guys, the veterans. These guys you don't see them as much on the street, most of them have their own families and they're kind of controlling and watching over things in the shadows. They're going to let the young kid get in trouble because the older guys have already done their time, they've earned the right to lean back and to supervise. The top guys that make the major decisions, all the way up, they are going to be called your shot callers."

Regarding group activities, Villanueva explained: "Broderick Boys patrol, they hang out in certain areas and just walk up and down the street. They call that patrolling. . . . Typically in their patrolling and representing, they'll have, well, it varies, you might see 1 or 2, but if you see 1 or 2 there's probably 3 or 4 in the wind close by. They act in packs, they act in groups. One guy on the corner isn't going to get the message of fear and intimidation across to the community and to rival gangs, but they don't like to hang out too deep with too many of them together because then they attract our attention, the police, and they know that we'll start doing what we do and investigate. So you'll see 1, 2, 3 guys walking around on one side of the block and the same time, you'll see another couple of guys on the other side of the block. They're working together. . . ."

We fail to see what it is defendants find deficient in the foregoing showing. Villanueva explained the gang signs and colors used by the Broderick Boys to identify themselves and put others on notice. He explained the offenses typically committed by gang members and that assaults are used by gang members to maintain fear and control. Villanueva also described the structure of the gang, including who makes the major decisions and who carries them out. Finally, he described how gang members work together to patrol their turf. Investigator Villanueva explained that his opinions and observations are based on hundreds of contacts and discussions with gang members, investigation of hundreds of crimes committed by gang members, and review of hundreds of police reports.

Defendants argue Investigator Villanueva's opinions and observations are refuted by those of their own gang expert and the more than 100 declarations of residents and others familiar with the Safety Zone. However, this was an issue of credibility for the trial court. "Where the evidence before the trial court was in conflict, we do not reweigh it or determine the credibility of witnesses on appeal. '[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts.' [Citation.] Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in

the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. [Citations.]" (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625 [43 Cal.Rptr.2d 774].)

Viewed in the light most favorable to the trial court's order, there is substantial evidence to support the conclusion the Broderick Boys is a criminal street gang operating in the Safety Zone. As for defendants' argument that plaintiff failed to establish the named defendants are active members of the Broderick Boys, they make no individualized arguments in this regard. In other words, defendants do not explain how the evidence is insufficient to establish any individual defendant is not an active member. "An appellate brief 'should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as [forfeited], and pass it without consideration.' [Citation.]" (*In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1164 [238 Cal.Rptr. 12].) It is not the function of this court to comb the record looking for the evidence or absence of evidence to support defendants' argument. (See Cal. Rules of Court, rule 8.204(a)(1)(C); *Grand v. Griesinger* (1958) 160 Cal.App.2d 397, 403 [325 P.2d 475].)

III

*Public Nuisance*

Defendants contend plaintiff failed to demonstrate the activities of alleged gang members were anything other than isolated instances of bad conduct amounting to a public nuisance. They argue plaintiff relied on the criminal records of the 23 named defendants and descriptions of other crimes allegedly committed by gang members, but most of those crimes were committed years ago and some were relatively minor. Defendants assert only 17 of the crimes occurred in 2006 or 2007. Defendants further assert only six of the described crimes involved a gang-related conviction. Defendants also argue there was no evidence of actual sightings of numerous gang members together in public places within the Safety Zone. Finally, defendants argue there was no evidence the level of criminal conduct was any greater in the Safety Zone than elsewhere in West Sacramento or was greater than that in a comparably sized city.

Defendants are mistaken that plaintiff relied solely on crimes committed by members of the Broderick Boys in the Safety Zone. As mentioned earlier, the court in *Englebrecht* explained that, in the context of a gang injunction, it is not necessary to prove the commission of criminal acts. Rather, it must be shown gang members "participate[] in or act[] in concert with an ongoing organization, association or group of three or more persons,

whether formal or informal, having as one of its primary activities the commission of *acts constituting the enjoined public nuisance*, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the *acts constituting the enjoined public nuisance*." (*Englebrecht, supra,* 88 Cal.App.4th at p. 1261, italics added.) Thus, conduct not amounting to a gang crime under Penal Code section 186.22 may be the subject of an action to abate a nuisance. (*Acuna, supra,* 14 Cal.4th at p. 1119.)

A nuisance is "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." (Civ. Code, § 3479.) "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons . . . ." (*Id.,* § 3480.)

As described in the preceding section, in addition to criminal acts, individual Broderick Boys members vandalize property in the Safety Zone with gang graffiti and intimidate residents with their gang signs, tattoos, and red clothing. They also patrol the Safety Zone in small groups, thereby reinforcing their control of the area. The individual crimes are merely the more serious types of conduct used by the Broderick Boys to maintain control of their turf.

■ Defendants argue no evidence was presented to tie any particular gang member to the graffiti observed in the Safety Zone. However, while such a showing would be necessary to prosecute an individual gang member for criminal vandalism, it is not required in order to use the graffiti as a basis for a gang injunction. It may reasonably be assumed such graffiti was the work product of some member of the gang, even if that member cannot be identified. It is the collective action of the gang, not that of any individual member, that determines whether a public nuisance exists.

As to defendants' argument that there was no evidence of actual sightings of numerous gang members patrolling the Safety Zone together, we need look no further than the declaration of Investigator Villanueva. As described above, Villanueva indicated Broderick Boys members typically patrol areas within the Safety Zone in small groups, because a "guy on the corner isn't going to get the message of fear and intimidation across to the community and to rival gangs." Unless we are to conclude Investigator Villanueva simply made this up, it is reasonable to assume he observed this activity within the Safety Zone or it was reported to him by others. As noted earlier, "we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order." (*Shoemaker v. County of Los Angeles, supra,* 37 Cal.App.4th at p. 625.)

As to the relative dearth of recent criminal offenses presented in support of the injunction, it must not be overlooked that during all of 2006 and much of 2007 an injunction was in place restricting the activities of the Broderick Boys in the Safety Zone. Also, Investigator Villanueva indicated the crimes he mentioned in his declaration were only "a sampling of some of the crimes committed by the Broderick Boys in the Safety Zone" that he personally investigated. The trial court was presented with the criminal records of the 23 named defendants, but not other gang members. Furthermore, the other intimidating conduct of the Broderick Boys tends to paralyze the community, which diminishes their need to actually commit further assaults to maintain control.

■ Regarding defendants' argument that only six of the offenses relied upon by plaintiff involved a gang charge, this is a nonstarter. Defendants cite a 2009 Court of Appeal decision for the proposition that "crimes that are not gang related are not a basis for concluding that they are being committed for the purpose of promoting or benefiting a criminal street gang." However, after defendants filed their opening brief in this matter, the opinion was ordered not to be published by the California Supreme Court. Furthermore, defendants' argument presupposes that a crime that is not *charged* as a gang offense is not gang related. But there may be many reasons why a prosecutor may choose not to charge a given crime as a gang offense, notwithstanding the fact it was committed in order to benefit the gang. Even crimes that were not technically committed for the purpose of benefitting a gang may nevertheless have that effect. Furthermore, a gang injunction may properly prohibit conduct of gang members irrespective of whether that conduct is undertaken to further the purposes of the gang. (*People ex rel. Totten v. Colonia Chiques* (2007) 156 Cal.App.4th 31, 44 [67 Cal.Rptr.3d 70] (*Totten*).) Thus, the lack of a gang enhancement or gang charge in connection with a given criminal prosecution is immaterial for purposes of the present injunction.

Finally, as to defendants' argument that there was no evidence the level of criminal conduct was any greater in the Safety Zone than elsewhere in West Sacramento or was greater than that in a comparably sized city, this has no bearing on whether the particular conduct in question here amounts to a public nuisance. It may be that the Safety Zone is not sufficiently inclusive or that gang conduct in other comparably sized cities also amounts to a public nuisance.

As explained above, a nuisance is anything that is injurious to health, such as the illegal sale of controlled substances, or is indecent or offensive to the senses, or obstructs the free use of property. (Civ. Code, § 3479.) A public nuisance is one which affects an entire community or neighborhood. (*Id.,* § 3480.) In this instance, Officer Angle of the West Sacramento Police

Department submitted a declaration in which he described his expertise in the area of illegal drug trade. Officer Angle opined that the Broderick Boys gang is a "major source of narcotics activity in the City of West Sacramento and particularly in the Safety Zone." In addition, the other declarations submitted by plaintiff, including that of Investigator Villanueva, when viewed in the light most favorable to plaintiff, support the trial court's conclusion plaintiff is likely to prevail on the merits of his public nuisance claim.

## IV

### Balance of Interests

Defendants contend plaintiff failed to establish that the denial of a preliminary injunction would cause more harm to the public than that suffered by defendants if the injunction were issued. According to defendants, the injunction "enjoins defendants and hundreds of unidentified other individuals from doing the most normal things in a wide swath of their own neighborhood: meeting with or being in the presence of anyone else on the secret list of Broderick Boys gang members; drinking an alcoholic beverage in a bar or restaurant or even on a porch or front yard (if it were deemed 'in public'); being out of their own home or apartment after 10:00 p.m. or before 6:00 a.m. the following day any day of the week . . . ." Defendants argue this clearly outweighs "the imagined harm" the residents of the Safety Zone would suffer if the interim relief were denied.

We are not persuaded. There is nothing "imagined" in the harm the residents of the Safety Zone are likely to suffer if the preliminary injunction were not issued. As Investigator Villanueva explained, the Broderick Boys "have consistently been engaged in violent gang crime and property crime in the residential areas of the Safety Zone for years." According to Villanueva, "[i]nnocent civilians are frequent victims of violent crimes committed by Broderick Boys in the Safety Zone," and "Broderick Boys have demonstrated that they will prey on innocent people in order to instill fear in the community and/or profit from their loss." Villanueva explained the Broderick Boys "commit a lot of witness intimidation," and this makes residents reluctant to be seen talking to the police. Potential witnesses will say, " 'yeah, you'll take this Broderick Boy to jail but what about his 40 or 50 friends that are going to show up tomorrow.' " Absent an injunction, it may be presumed this conduct would continue.

On the other side of the coin, defendants overstate the harm they will suffer from the court's granting the interim relief. Defendants, of course, cannot claim harm from any restrictions in the activities that constitute the public nuisance. As to nonnuisance conduct, the injunction applies only to "active members" of the

Broderick Boys, where that term is defined to encompass only those who participate in or act in concert with the gang to an extent more than nominal, passive, inactive, or purely technical. Furthermore, the injunction applies only within the Safety Zone. And, as we shall explain in the following sections, the proper breadth of the injunctive relief is not as extensive as defendants claim.

██ In light of the evidence of harm caused by the Broderick Boys within the Safety Zone, which harm will presumably continue absent injunctive relief, we find no abuse of discretion in the trial court's determination that the potential harm to residents of the Safety Zone if the preliminary injunction is denied is not outweighed by the potential harm to the defendants and other active gang members if the injunction is granted.

V

*Definition of Active Gang Member*

The preliminary injunction applies to the named defendants and all other "active members" of the Broderick Boys. The injunction includes the following definition of "active member": "[A] person who participates in or acts in concert with Broderick Boys. The participation or acting in concert must be more than nominal, passive, inactive or purely technical. The following factors may be used to determine whether an individual is an 'active member' of Broderick Boys: (1) whether the subject admits to being a member of Broderick Boys, (2) whether the subject has tattoos that are only associated with Broderick Boys, (3) whether the subject has been arrested while participating with active members of Broderick Boys, or (4) whether a reliable informant provides information that the subject is an active member of Broderick Boys. Clothing, accessories, photographs and close association with known gang members may be relevant to whether a person is an active gang member, but these factors alone are insufficient to validate a subject as an 'active member' of Broderick Boys for purposes of this injunction."

Defendants contend the foregoing definition of "active member" fails to specify how a particular individual will be validated as a gang member and, therefore, confers too much discretion on law enforcement authorities. Although the definition identifies four factors to consider, "it does not prescribe the weight to be given those factors in making the determination and provides no limitations on law enforcement's discretion in validating alleged members of the 'Broderick Boys.' "

██ Inasmuch as defendants themselves are subject to the preliminary injunction by virtue of being named defendants in the action and being the

subject of proof that they have actively participated in gang activities, and not because of the foregoing definition, they lack standing to challenge that definition on behalf of parties not before the court. (*Totten, supra,* 156 Cal.App.4th at p. 42.) " 'A party must assert his own legal rights and interests and cannot rest his claim to relief on the rights or interests of third parties.' " (*Ibid.*)

██ At any rate, we disagree with defendants that the definition of "active member" in the injunction is unconstitutionally vague. Of necessity, the definition cannot be much more specific. It is not likely criminal street gangs maintain rosters of their active members. Such membership must be determined from the individual's actions. In *Englebrecht,* the court indicated that "for the purposes of a gang injunction an active gang member is a person who participates in or acts in concert with" the gang, so long as such participation or acting in concert is "more than nominal, passive, inactive or purely technical." (*Englebrecht, supra,* 88 Cal.App.4th at p. 1261.) The court further indicated that factors nearly identical to those mentioned in the definition at issue here "may provide a useful guide for determining if a defendant is a gang member but they do not ultimately define the concept of membership in the gang abatement injunction context." (*Ibid.*)

The definition utilized here contains the same flexibility as that presented in *Englebrecht.* The four factors—self-identification, gang tattoos, crimes committed with other gang members, and information from reliable informants—"may be used" to determine active gang membership but do not alone define the concept. Participation of the alleged member "must be more than nominal, passive, inactive or purely technical." Other factors that may be considered are "[c]lothing, accessories, photographs and close association with known gang members."

██ " 'Two principles guide the evaluation of whether a law . . . is unconstitutionally vague. First, "abstract legal commands must be applied in a specific *context.* A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness." [Citation.] Second, only reasonable specificity is required. [Citation.]' " (*Totten, supra,* 156 Cal.App.4th at p. 47.) ██ In the context of a gang injunction, only a reasonably specific definition of "active member" is possible in order to give adequate notice while encompassing those who primarily contribute to creation of the public nuisance. We conclude the definition at issue here is sufficiently specific.

## VI

### *Association Provision*

Defendants challenge a number of individual provisions of the preliminary injunction. Paragraph (1)(a), the nonassociation provision, prohibits: "Standing, sitting, walking, driving, gathering or appearing, anywhere in public view or anyplace accessible to the public, with any known member of the Broderick Boys including but not limited to those members identified by name in this order. This nonassociation order shall not apply when the enjoined parties are inside a school attending class or on school business, or inside a church; however, the nonassociation order shall apply to the enjoined parties when they are traveling to or from any of [*sic*] school or church." Defendants contend this provision infringes on their constitutional rights by prohibiting them from gathering in public places for lawful and peaceful purposes and interfering with intimate family relationships. According to defendants, "[i]f multiple family members are validated as active gang members, they would not only be prohibited from appearing any place in public together but they would also be prohibited from traveling inside the [S]afety [Z]one together even when they are engaged in a wholly innocent and legal activity such as driving, walking or taking a bus to church or to school."

 "An injunction may not burden the constitutional right of association more than is necessary to serve the significant governmental issue at stake. ([*Acuna*], *supra*, 14 Cal.4th at pp. 1115, 1120–1122.) The Constitution shields from government intrusion a limited right of association. One such protected association—not asserted here—is instrumental to forms of political and religious expression and activity. The others—asserted here—are associations with 'intrinsic' or 'intimate' value. These are 'exemplified by personal affiliations that "attend the creation and sustenance of a family—marriage . . . ; the raising and education of children [citation]; and cohabitation with one's relatives." [Citation.]' ([*Acuna*], *supra*, 14 Cal.4th at p. 1110.)" (*Englebrecht, supra*, 88 Cal.App.4th at p. 1262.)

In *Englebrecht*, the gang injunction prohibited members from: " 'Standing, sitting, walking, driving, bicycling, or gathering anywhere in public view with any other defendant herein, or with any other known Posole gang member. This prohibition shall not apply to named defendants living in the target area on November 25, 1997, who are father and sons/daughters, mothers/sons/daughters . . . .' " (*Englebrecht, supra*, 88 Cal.App.4th at p. 1243, fn. 2.) The Court of Appeal found this provision did not unnecessarily impinge upon familial association rights, explaining:

"Collective activity by gang members is at the core of the nuisance the injunction justifiably attempts to abate. While it may be that many gang members are also related by family, and while the injunction's associational restrictions may affect, in the target area, contact between those family members, those facts are not determinative. The injunction places no restrictions on contact between any individuals outside the target area. In the target area the injunction merely requires gang members not to associate in public. While the injunction may place some burden on family contact in the target area, it by no means has, in our view, a fundamental impact on general family association.

"Any attempt to limit the familial associational impact of the injunction would make it a less effective device for dealing with the collective nature of gang activity. [The defendant] makes much of the point that gang and familial ties often overlap and gang membership is often multigenerational. While such observation shows the possible unintended effect of gang association restrictions on families, it also indicates that any change in the injunction to allow greater association of family-related gang members would tend to limit the effectiveness of the association provisions. Such a limitation on the injunction would in general also make it more difficult to enforce." (*Englebrecht, supra*, 88 Cal.App.4th at p. 1263.)

In *Totten*, the injunction contained a provision similar to that at issue here. It prohibited gang members from: " 'Standing, sitting, walking, driving, gathering or appearing, anywhere in public view or anyplace accessible to the public, with any known member of COLONIA CHIQUES EXCEPT: (1) when all members are inside a school attending a class or on school business; (2) when all members are inside a church; and/or (3) actively engaged in some business, trade, profession or occupation which requires such presence, provided the prohibition against associating shall apply to all forms of travel (except in school buses) to or from any of the locations described in (1)–(3) above.' " (*Totten, supra*, 156 Cal.App.4th at pp. 45–46.) Relying on *Englebrecht*, the Court of Appeal rejected the defendants' contention the provision was too broad because it failed to except associations with family members. (*Ibid.*)

We reach the same conclusion here. The nonassociation provision applies only within the Safety Zone and only in public places other than schools and churches. Although it places an incidental burden on familial relationships, such burden is necessary under the circumstances in order for the injunction to be effective. The injunction does not burden associational rights more than is necessary to serve the significant governmental interests at stake.

## VII

### *Controlled Substance Provision*

Paragraph (1)(e) of the preliminary injunction prohibits, "[w]ithout a prescription, (1) selling, possessing, or using any controlled substance or related paraphernalia, including but not limited to rolling papers and pipes used for illegal drug use, (2) knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or such related paraphernalia, or (3) knowingly remaining in the presence of any controlled substance or such related paraphernalia."

Defendants contend this provision is unnecessarily broad, especially in light of the fact there is no evidence indicating the use or sale of controlled substances is a problem in the Safety Zone, is an activity of the Broderick Boys, or is in furtherance of Broderick Boys interests. Defendants argue "controlled substance" includes prescription drugs used to treat common medical conditions. Therefore, they argue, the provision would prohibit gang members from entering any store where prescription drugs are sold and would prohibit gang members from being in the presence of a relative or friend who is legally in possession of prescription drugs.

Plaintiff counters that, read in context, paragraph (1)(e) "is a prohibition on selling, possessing, or using of [*sic*] illegal drugs or paraphernalia, knowingly being around someone who is, or knowingly remaining in the presence of illegal drugs or paraphernalia." Plaintiff argues this follows from the fact the first three words of the provision, "[w]ithout a prescription," apply to all three clauses within.

We fail to follow plaintiff's logic. Even if the words "[w]ithout a prescription," applies to all three clauses of paragraph (1)(e), this would not change the nature of the prohibition. The second clause prohibits gang members from knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or related paraphernalia. Does application of the "[w]ithout a prescription" language mean the gang member does not have a prescription or the person with the controlled substance does not have a prescription? Either way, this prohibition would prohibit the gang member from being in any store where prescription drugs are sold. Similarly, the third clause prohibits gang members from being in the presence of controlled substances without a prescription. This again would prohibit gang members from entering stores where prescription drugs are sold.

In *Totten*, the injunction prohibited gang members from "possessing controlled substances without a prescription." (*Totten, supra,* 156 Cal.App.4th at

p. 37.) In *Englebrecht*, the injunction prohibited gang members from " '[p]articipating in the use, possession and/or sale of narcotics' " and " '[b]eing present in a vehicle found to have any . . . narcotics . . . with knowledge of . . . narcotics . . . .' " (*Englebrecht, supra*, 88 Cal.App.4th at pp. 1243–1244, fn. 2.) Neither provision would have prohibited gang members from entering stores where controlled substances are sold or being in the presence of a family member who is in possession of a controlled substance with a prescription.

Reasonably read, paragraph (1)(e) would prohibit gang members from entering a public store where prescription drugs are sold. The provision is also vague as to whether the "[w]ithout a prescription" language applies to each clause and whether it means a prescription held by the gang member or the person in possession of a controlled substance in the gang member's presence. Paragraph (1)(e) therefore cannot stand.

## VIII

### *Trespassing Provision*

Paragraph (1)(h) of the preliminary injunction prohibits gang members from "[b]eing present on or in any property not open to the general public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property." Defendants contend this provision infringes on familial association rights because, hypothetically, "persons would be in contempt of the injunction order if they go to a relative's home where the owner may not be home or is home but unable to give consent due to a health emergency."

We are not persuaded. As noted earlier, an injunction may not impose a greater burden on the constitutional right of association than is necessary to serve the governmental interest at stake. (*Acuna, supra*, 14 Cal.4th at pp. 1115, 1120–1122.) Investigator Villanueva explained the Broderick Boys take advantage of other people's property to commit crimes. They will use abandoned property as a "crash pad" where they can drink and do drugs. Gang members will also take over parking lots as well as apartment building courtyards, basements, and rooftops. According to Villanueva, gang members will also use private residences to escape police pursuit.

The only burden placed upon associational rights by paragraph (1)(h) is a requirement that gang members obtain advance written permission to be in the homes of others living in the Safety Zone. Once such permission is

obtained, the gang member may be present in the home at times when the owner is absent or is unable to give consent due to health reasons. In our view, paragraph (1)(h) does not impose a greater burden on association rights than is necessary to serve the public interest involved.

## IX

### *Curfew Provision*

Paragraph (1)(g) of the preliminary injunction contains the following curfew restriction: "Remaining upon public property, a public place, on the premises of any establishment, or on a vacant lot, between the hours of 10:00 p.m. on any day and 6:00 a.m. the following day. . . ." This provision defines "public place" as "any place to which the public has access, including but not limited to sidewalks, alleys, streets, highways, parks, the common areas of schools, hospitals, office buildings, and transport facilities." It further defines "establishment" as "a restaurant, bar, nightclub, shop, or other privately-owned business operated for profit to which the public is invited." However, the following are expressly excluded from the curfew provision: "(1) a meeting or scheduled entertainment activity at a theater, school, church or other religious institution, or sponsored by a religious institution, local education authority, governmental agency or support group like Alcoholics Anonymous; (2) actively engaging in a business, trade, profession or employment which requires such presence; (3) in an emergency situation . . . ; or (4) in the side yard or back yard of his/her own residence."

Defendants argue this provision infringes on their constitutional freedom of movement and is otherwise vague and overbroad. They argue the Fourteenth Amendment protects a person's right to remain in a public place for a lawful purpose. They further argue the provision arbitrarily designates acceptable entertainment activities by permitting travel to and from school or church activities or a movie theater but prohibiting travel to and from a concert or sporting event. Defendants assert this distinction is not rationally related to the alleged public nuisance.

Regarding the rationale underlying paragraph (1)(g), Investigator Villanueva opined: "Generally Broderick Boys will use nightfall, they use the cloak of darkness, to go out and commit some of their illicit crimes. Although we also see them during the daytime. Gang activity is 24/7, but it's worse at night. And generally, if they're out at night, they're up to no good. They're going to use the nightfall to go out and do some of these assaults, robberies, felony vandalism. So, generally when you see the gangsters out after curfew hours, they're up to no good, and that's both adults and juveniles. . . . [M]any serious Broderick Boy[s] crimes happen after 10 p.m. and before sunrise."

In *Totten, supra*, 156 Cal.App.4th at page 47, the gang injunction prohibited members from " '[b]eing outside [in the Safety Zone] between the hours of 10:00 p.m. on any day and sunrise the following day, unless (1) going to or from a legitimate meeting or entertainment activity (specifically excluding activities where other gang members are present); (2) actively engaged in some business, trade, profession or occupation which requires such presence (including directly driving to or from work); or (3) involved in a legitimate emergency situation that requires immediate attention.' "

The Court of Appeal found this provision unconstitutionally vague. First, the court found the provision vague in failing to define "outside." The court questioned: "Does this mean that a gang member is in violation of the injunction, and subject to arrest, if he or she is sitting in the open air on the front porch of his or her residence, or if he or she is standing on his or her own front lawn, or if he or she is at a late night barbecue in the backyard? Is a gang member 'outside' if he or she is sitting inside a vehicle parked on the street? Is a gang member in violation of the injunction if he or she is present at a 'legitimate meeting or entertainment activity' that occurs 'outside' in the open air?" (*Totten, supra*, 156 Cal.App.4th at p. 48.)

The court also found the provision unconstitutionally vague in failing to define the " 'meeting or entertainment activity' " exception to the curfew provision. (*Totten, supra*, 156 Cal.App.4th at p. 49.) Regarding the word "meeting," the court asked: "If a gang member is traveling 'outside' for the purpose of visiting nongang family members or friends who live in the Safety Zone, is he or she going to a 'meeting' within the meaning of the exception to the curfew provision? The broad dictionary definition of 'meeting' could encompass such an informal social gathering. Or does 'meeting' apply only to a formally organized gathering, such as a meeting at a church, school, or community center?" (*Ibid.*) The court also found the term "entertainment activity" vague. According to the court, "entertainment" "could encompass practically any lawful activity that provides diversion or amusement, such as a walk in the park." (*Ibid.*) The court further questioned: "Does 'entertainment activity' apply only to activities occurring at places of entertainment open to the public, such as restaurants, theaters, and nightclubs? If a gang member is going to a party at someone's home in the Safety Zone, is he or she going to an 'entertainment activity' within the meaning of the exception to the curfew provision? Is he or she going to an 'entertainment activity' if visiting a friend's house in the Safety Zone to watch a DVD movie on a big-screen television?" (*Ibid.*)

The curfew provision at issue here does not suffer from the foregoing ambiguities. It bars gang members from any "public property, a public place, on the premises of any establishment, or on a vacant lot" during curfew

hours. Public place is defined as "any place to which the public has access, including but not limited to sidewalks, alleys, streets, highways, parks, the common areas of schools, hospitals, office buildings, and transport facilities." Clearly, this provision does not encompass a private front porch, front yard or backyard. However, it does include sitting in a vehicle parked on a public street. It may cover a meeting or entertainment activity if such activity occurs on public property or other place open to the public.

The provision has an exception for "a meeting or scheduled entertainment activity at a theater, school, church or other religious institution, or sponsored by a religious institution, local education authority, governmental agency or support group like Alcoholics Anonymous." There is no ambiguity as to whether the provision applies to an informal meeting at a private home, since the provision applies only to public places. There is also no ambiguity as to whether the provision applies to a gang member being at a friend's home for a party or to watch a DVD so long as he or she does not go or return during curfew hours. Again, the provision applies only to public places.

 Defendants contend the curfew provision is nevertheless overbroad. "The overbreadth doctrine provides that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' [Citation.]" (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 577 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

However, defendants' overbreadth argument amounts to a claim that the exception for particular meetings or scheduled entertainment activities is not rationally related to the alleged nuisance. In other words, defendants argue, the exception does not go far enough. But defendants provide no basis for the underlying premise of their argument—that the provision must contain an exception for all possible meetings and scheduled entertainment activities in order not to be overbroad. The fact that the injunction contains some exceptions does not mean it must contain others.

Under the circumstances presented, the curfew provision, which applies only to public property, public places, private establishments open to the public, or vacant lots within the Safety Zone, with certain limited exceptions, does not sweep too broadly or invade protected freedoms of defendants and other active gang members.

X

*Alcohol Provision*

Paragraph (1)(f) of the preliminary injunction prohibits, "[a]nywhere in public view or anyplace accessible to the public, (1) possessing an open

container of an alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an alcoholic beverage." Defendants contend this provision is unlawful because there is no evidence Broderick Boys gang members abuse alcohol or that alcohol plays any part in the alleged nuisance. Defendants further contend the provision is unconstitutionally vague, as it cannot be determined if it applies to a gang member being in the presence of someone in a bar or restaurant with an open container of an alcoholic beverage.

Regarding justification for the alcohol prohibition, Investigator Villanueva explained that Broderick Boys gang members are often seen together in residential areas and "[f]requently, they are seen drinking alcohol or using narcotics in open view." Villanueva further explained "Broderick Boys will often congregate near the banks of the Sacramento River to drink alcohol or use narcotics in public view." According to Villanueva, this has been used by the Broderick Boys to create or reinforce public intimidation.

Defendants' claim of vagueness stems from the following comment by plaintiff's counsel during argument: "This provision is tempered. There are limitations even in the provision that we've submitted to the court, where if the individual is in their own home, somebody else's home, in a bar, in a restaurant, the provision simply does not apply to them. What this is attempting to do is prohibit the alcohol consumption and possession out in public . . . ."

Defendants argue the foregoing interpretation of the alcohol provision appears to contradict the plain language of the provision. The provision prohibits being in the presence of an open container "[a]nywhere in public view or anyplace accessible to the public." A bar or restaurant would appear to be a place in public view or accessible to the public. Defendants argue that if plaintiff himself cannot determine what the provision means, then the provision must be " 'in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " (*Acuna, supra*, 14 Cal.4th at p. 1115.)

We agree. The danger described by Investigator Villanueva was that gang members would drink alcoholic beverages and consume narcotics out in the open in view of the public, thereby creating an intimidating atmosphere. Plaintiff's counsel argued that this is what the provision is intended to do. Nevertheless, the language used is at least susceptible of a broader interpretation that would include the consumption of alcoholic beverages in restaurants or bars open to the public. Under these circumstances, the provision does not provide adequate notice of what is prohibited, and violates due process.

### DISPOSITION

The order granting a preliminary injunction is reversed insofar as it requires compliance with the controlled substances provision, paragraph (1)(e), and the alcohol provision, paragraph (1)(f). Nothing in this opinion is intended to suggest that plaintiff may not move the trial court to amend as appropriate paragraphs (1)(e) or (1)(f) of the preliminary injunction. In all other respects, the order is affirmed. The parties shall bear their own costs on appeal.

Scotland, P. J., and Nicholson, J., concurred.