Filed 6/18/14  Gilmore Bank v. Dalrymple CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GILMORE BANK et al., | |
| Plaintiffs and Respondents, | G047902 |
| v. | (Super. Ct. No. 30-2011-00452056) |
| CINDY DALRYMPLE et al, | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Frederick P. Horn, Judge.  Affirmed.

Pacific Business Law Group, APC and James M. Jimenez for Defendants and Appellants.

Hallstrom, Klein & Ward and David T. Ward for Plaintiffs and Respondents.

\* \* \*

Plaintiffs Gilmore Bank and Jay Cho seek to collect a $3.2 million judgment from judgment debtor, Cindy Dalrymple.[1]  Toward this end, they have sued Cindy and other defendants for fraudulently transferring and sequestering her assets.

This appeal concerns the trial court's order granting plaintiffs' motion for a preliminary injunction requiring defendants to repatriate to the United States all assets they transferred to a New Zealand trust and into a Swiss annuity.[2]  Defendants contend the court abused its discretion by granting the injunction.  They argue insufficient evidence supports the court's underlying factual findings.  Defendants, however, have waived this issue by disregarding their obligation to provide a summary of the significant facts in their opening brief.  (Cal. Rules of Court, rule 8.204(a)(2)(C).)  And, in any event, abundant substantial evidence supports the court's findings.  Accordingly, we affirm the court's order.

---

[1]  For ease of reference and to avoid confusion, we sometimes refer to Cindy Dalrymple and her niece, Sonia Jolene Dalrymple, by their first names.  We intend no disrespect.

[2]  The court's order also froze defendants' assets (except for scheduled disbursements for Cindy's living expenses), and restrained defendants from transferring any real or personal property held or controlled by them or their agents or trustees. Defendants do not challenge these parts of the order.
The court's order is appealable under Code of Civil Procedure section 904.1, subdivision (a)(6).  All further statutory references are to the Code of Civil Procedure unless otherwise stated.

FACTS[3]

*The Underlying Judgment and Cindy's Initial Transfers of Her Assets*

In 1992, Cindy and her partner formed a company named Alliance Technology, Inc. (ATI), to make electrical components for Aviza. Thus, Aviza was always ATI's primary customer. In 2000, Cindy became the sole owner of ATI.

In a December 2006 meeting with Cindy, several high-ranking officials of Aviza told her that Aviza planned to outsource much of its business to another supplier. Although the timing of the switch was uncertain, Cindy realized that her company, ATI, faced a big drop in volume and profitability.

Cindy quickly engaged a broker to try to sell ATI. In August 2007, she began negotiations to sell ATI to plaintiff Cho in a transaction financed by plaintiff Gilmore Bank. During the negotiations, Cindy did not tell plaintiffs, or even her own broker, of ATI's impending loss of much of Aviza's business. Instead, she said ATI's relationship with Aviza had survived for 16 years and was likely to continue indefinitely, and that there had been no change in the relationship. Cindy blocked plaintiffs from directly questioning Aviza during the due diligence period, saying she "did not want them to impact her relationship with" Aviza before the sale closed.

In December 2007, Cindy sold ATI to Cho for $2.2 million. Gilmore Bank financed Cho's purchase. Within six months of the sale, ATI's revenues dropped precipitously and it laid off all its workers and closed.

Cho commenced arbitration proceedings against Cindy for misrepresentation and other causes of action.

---

[3] We take the facts from the declarations and exhibits that were before the court when it ruled on plaintiffs' motion for a preliminary injunction. Defendants' opening brief contains virtually none of the facts recited in this opinion.

In October 2009, Cindy retained attorney William Norman for the alleged purpose of preparing her estate and retirement plan. Norman knew that a claim for over $1 million had been lodged against Cindy for misrepresentations and nondisclosure in the sale of her business.

In December 2009, Cindy owned over $5 million in assets, including over $3.5 million in cash and securities and over $1 million worth of real estate. That month, she formed a Wyoming limited liability company (LLC) named Enchantment Management, LLC (Enchantment), of which she was the president, a manager, and a member with a 99 percent interest. The next month, she transferred $3 million in cash and securities into the newly formed account of another LLC set up by Norman, this one called the CD Investment Series LLC (CDIS), of which Enchantment was the manager and initially its sole member.

On January 12, 2010, the second day of the arbitration hearing, Cindy formed a trust — the CD Private Retirement Trust (Cindy's Retirement Trust) — and appointed her 25-year-old niece, Sonia, as the trustee. At its inception, Cindy's Retirement Trust owned 99 percent of CDIS (which held two real properties and over $3.5 million in cash and securities). Cindy's Retirement Trust provides that the trustee is to pay Cindy $203,000 of trust income or capital every year during Cindy's lifetime.

On January 19, 2010, the three-arbitrator panel in the arbitration proceeding issued an interim award in Cho's favor. The arbitrators found that, during the sale negotiations, Cindy made false and misleading statements to plaintiffs and failed to tell them that ATI faced a significant loss of business and that its sales volume and profits would plummet. The award ordered Cindy to pay Cho over $3 million in damages, as well as attorney fees and costs.

In mid-January of 2010, attorney Norman learned of the arbitration award against Cindy. Norman realized that a reserve had to be built into Cindy's retirement plan to cover the claim. He believed that a reserve of $1.4 million would be sufficient.

4

(In an October 2012 deposition, he testified the reserve was in the form of Cindy's real properties, collectibles, automobile, and a Roth individual retirement account (IRA).) But in reality, no such reserve was set aside.

The final arbitration award, dated March 25, 2010, awarded Cho approximately $3.2 million.

In June 2010, the court entered a judgment of almost $3.3 million on the arbitration award in plaintiffs' favor against Cindy and ATI.

Cindy resigned as manager of Enchantment in April 2010. But she retained possession of a checkbook until 2012 and continuously served as Sonia's "advisor" with respect to the trust.

*Plaintiffs' Action Against Cindy for Fraudulently Transferring Her Assets*

In February 2011, plaintiffs sued Cindy, Sonia (as trustee of Cindy's Retirement Trust), Enchantment, other LLCs, Norman's law firm, and other defendants for fraudulent transfers and other causes of action. (In this opinion we refer to Cindy, Sonia, and the defendant entities collectively as "the Dalrymple defendants.") Plaintiffs' complaint alleged that, at the start of the arbitration proceeding, Cindy owned assets valued at over $5 million, but during the proceeding, as her liability became clear, she frantically formed trusts and other entities, fraudulently transferred her assets to them in order to hinder plaintiffs from collecting their claims, and appointed Sonia as the trustee or manager of the newly formed trusts and entities. Plaintiffs further alleged that Cindy's Retirement Trust initially held $3 million in stocks and bonds (as well as a significant amount of cash and other assets), but, recently, $1 million of its assets had "disappeared." Plaintiffs further alleged that defendants knew that plaintiffs would satisfy their judgment from Cindy's assets, but defendants nonetheless fraudulently concealed and transferred Cindy's assets to hinder, delay, and defraud plaintiffs.

5

*Cindy's Transfer of Her Assets Overseas*

In December 2010, at the recommendation of her attorney, Sonia formed an irrevocable trust ("the New Zealand Trust"), of which AsiaTrust New Zealand Limited was the trustee, and Sonia (trustee of Cindy's Retirement Trust) was the settlor. The beneficiaries of the New Zealand Trust are the trustee and beneficiaries of Cindy's Retirement Trust, including Cindy. The trust deed empowers Sonia to carry out her fiduciary duties to Cindy (the beneficiary of Cindy's Retirement Trust) and to recommend to AsiaTrust that retirement benefits be paid directly to beneficiaries of Cindy's Retirement Trust.

In June 2011, Cindy transferred $2.5 million to SwissGuard International, Gmbh (SwissGuard), as well as $500,000 to "Checking Legal." Pursuant to her attorney's directions, Sonia sent the $500,000 to the New Zealand Trust.

In September 2011, SwissGuard issued a Swiss annuity certificate reflecting that (1) the New Zealand Trust is the owner and beneficiary of the annuity, (2) the insured person is Cindy, (3) the annuity was purchased for $2.5 million, (4) the annuity pays about $67,500 every quarter, and (5) the annuity income is payable so long as Cindy lives. At the time the annuity was issued, Cindy was 55 years old. Three months earlier, in June 2011, SwissGuard had advised Cindy that it would be "[v]ery easy" to cash in the annuity and that the process would normally take from 30 to 45 days.

In September 2011, Sonia authorized the distribution of $70,000 from the New Zealand Trust to Cindy's Retirement Trust. Sonia's understanding was that the Swiss annuity makes payments to the New Zealand Trust, which holds the money until Sonia requests it. The annuity makes payments of around $67,000 every quarter, which equals about $250,000 per year.

In a June 2012 deposition, Sonia testified, as to the $500,000 she sent to the New Zealand Trust, she had no idea where in New Zealand or in what form the funds are held, or who is a signatory to the account or otherwise has access to the money, or

6

whether she can retrieve the money. She did not know whether the $500,000 constituted a fee, or an investment, or how it should be characterized. Similarly, as to the quarterly payments from the Swiss annuity to the New Zealand Trust's account, Sonia had no idea where in New Zealand the account was maintained.

In June 2012, plaintiffs amended their complaint to name AsiaTrust (as trustee of the New Zealand Trust) as a defendant. In February 2014, we held that the trial court had personal jurisdiction over AsiaTrust. (*Gilmore Bank v. AsiaTrust New Zealand LTD.* (2014) 223 Cal.App.4th 1558.)

*Preliminary Injunction*

On July 10, 2012, plaintiffs moved for a preliminary injunction, alleging that, in around September 2011, defendants had "moved and sequestered [Cindy's] assets . . . to an off-shore trust and annuity in a blatant attempt to move them beyond the jurisdiction of the Court and out of reach of collection on the Judgment." Plaintiffs sought a preliminary injunction, asking the court to, inter alia, "order that the off-shore assets be repatriated to the United States to restore the status quo."

In a supporting declaration, plaintiffs' attorney described his recent discovery of defendants' offshore trust. He declared he had filed 20 motions to compel production of documents, before defendants finally responded and produced over 10,000 documents on April 30 or May 1 of 2012. Based on those documents, the attorney's firm deciphered that $2.5 million had been transferred offshore through a New Zealand trust into a Swiss annuity. Plaintiffs' attorney asked defense counsel for the trust document, which was not produced by defendants until June 2012. Plaintiffs' counsel then learned that $3 million of Cindy's assets — i.e., all her liquid assets — were held by the New Zealand Trust. The documents produced by defendants further revealed that in September 2011, CDIS had sold one of her real properties. Additionally, between 2011

7

and 2012, defendants had transferred at least $500,000 to their counsel, James Jimenez of the Pacific Business Law Group.

In another supporting declaration, an estate and tax planning attorney declared that Cindy's trust, LLCs, and retirement plan include Cindy as the creator, beneficiary, and person with ultimate control and therefore afford her no estate tax savings (a typical goal of a retirement plan), nor does her offshore trust or annuity generate any estate tax savings. In order to be exempt from collection of money judgments, the retirement plan must have been established for retirement purposes only. Because Cindy and the other persons who created her retirement plan knew of the claims and liabilities asserted against her at the time they established her retirement plan, the plan did not meet the requirement of being established for retirement purposes only. The attorney opined "the plan was created solely for the purpose of avoiding a known and existing creditor's claim" and that withdrawals from the plan were "not being used primarily for 'retirement purposes.'"

Defendants' opposition to plaintiffs' preliminary injunction motion was supported by the declarations of Cindy, Sonia, Norman, and their counsel, Jimenez.

On December 3, 2012, the court granted plaintiffs' motion for a preliminary injunction requiring defendants to, inter alia, repatriate to the United States all assets they transferred to the New Zealand Trust and the Swiss Annuity.

DISCUSSION

Defendants contend the court abused its discretion by granting plaintiffs' motion for a preliminary injunction. They argue the court could not have properly concluded that (1) plaintiffs were likely to prevail on the merits at trial, or (2) plaintiffs were likely to suffer irreparable harm absent a preliminary injunction.

8

"[T]he decision to grant a preliminary injunction rests in the sound discretion of the trial court." (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.) "[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*Id.* at pp. 69-70.)

"An appeal from an order granting a preliminary injunction involves a limited review of these two factors — likelihood of success on the merits and interim harm. If the trial court abused its discretion on either factor, we must reverse." (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625 (*Shoemaker*).)

In conducting this limited review, we do "not 'resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses.'" (*ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1016.) Instead, we view the evidence in the light most favorable to the prevailing party, draw inferences in favor of upholding the court's order (*Schwartzman v. Wilshinsky* (1996) 50 Cal.App.4th 619, 626), and imply all findings necessary to support the order (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928). Our "task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence." (*Shoemaker*, *supra*, 37 Cal.App.4th at p. 625.)[4] A trial court's order "must be upheld if it

_____

[4] At the hearing on plaintiffs' motion for a preliminary injunction, the court stated that its tentative ruling would "be the ruling." The court's minute order granting plaintiffs' motion, however, does not expressly incorporate or adopt the court's tentative ruling. Defendants, relying on *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300, contend we are "limited to review of the minute order . . . and must disregard the tentative ruling . . . ." We need not address their contention, as we can easily discern the court's implied findings without resort to its tentative ruling. "Implicit in the court's order granting the preliminary injunction is the fact that the trial judge resolved . . . conflicts in favor of the plaintiffs." (*Wind v. Herbert* (1960) 186 Cal.App.2d 276, 284.)

9

is supported by substantial evidence, no matter how slight it may be." (*Schwartzman*, at p. 626.)  Defendants bear the burden "'to make a clear showing of an abuse of discretion.'" (*Shoemaker*, at p. 624.)

The usual purpose of a preliminary injunction is to preserve "the status quo until a final determination of the merits of the action." (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528.)  "'Where, as here, the preliminary injunction mandates an affirmative act that changes the status quo, [i.e., in the case of a mandatory injunction,] we scrutinize it even more closely for abuse of discretion.'" (*Shoemaker*, *supra*, 37 Cal.App.4th at p. 625.)  It has been said that a ""preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal.""" (*Id.* at p. 626.)  Yet, the "'principles upon which mandatory and prohibitory injunctions are granted do not materially differ.  The courts are perhaps more reluctant to interpose the mandatory writ, but in a proper case it is never denied.'" (6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 280, p. 222.)

In "a clear case of prospective injury," a court may properly grant a mandatory preliminary injunction. (*Alvarez v. Eden Township Hospital Dist.* (1961) 191 Cal.App.2d 309, 312)  Indeed, in such a case, an injunction may be necessary to prevent an irreparable altering of the status quo.  In *F.T.C. v. Affordable Media*, *LLC* (9th Cir. 1999) 179 F.3d 1228, the lower court issued a mandatory preliminary injunction against two defendants, requiring them "to repatriate any assets held for their benefit outside of the United States." (*Id.* at p. 1232.)  The two defendants, along with AsiaCiti Trust Limited,[5] were cotrustees of an irrevocable trust formed under the laws of the Cook Islands. (*Ibid.*)  The Ninth Circuit held "the district court did not abuse its discretion in issuing the preliminary injunction." (*Id.* at p. 1238)  *F.T.C.* describes at length the use of

---

[5]  AsiaCiti Trust Limited is, coincidentally, the parent company of AsiaTrust, the trustee of the New Zealand Trust here. (*Gilmore Bank v. AsiaTrust New Zealand LTD.*, *supra*, 223 Cal.App.4th at p. 1564.)

10

"'[s]o-called asset protection trusts . . . to shield wealth by moving it to a foreign jurisdiction that does not recognize U.S. judgments or other legal processes, such as asset freezes'" in order "to frustrate and impede the United States courts by moving their assets beyond those courts' jurisdictions." (*Id*. at p. 1240.)

As noted, plaintiffs' motion for a preliminary injunction sought to *restore* the status quo back to the playing field that existed when they filed their fraudulent transfer lawsuit (before defendants sequestered assets overseas).

*The Court Did Not Abuse Its Discretion by Finding Plaintiffs Were Likely to Prevail on the Merits*

Defendants argue "that the transfers of assets into the [New Zealand] Trust and the Swiss Annuity were made in connection with [Cindy's] establishment of a private retirement plan, rendering these assets exempt from procedures to enforce money judgments" under the exemption established by section 704.115. Plaintiffs contend that defendants made the transfers with an intent to defraud their creditors and not for Cindy's retirement purposes.

"A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim. However, a conveyance will not be considered fraudulent if the debtor merely transfers property which is otherwise exempt from liability for debts. That is, because the theory of the law is that it is fraudulent for a judgment debtor to divest himself of assets against which the creditor could execute, if execution by the creditor would be barred while the property is in the possession of the debtor, then the debtor's conveyance of that exempt property to a third person is not fraudulent." (*Yaesu Electronics Corp. v. Tamura* (1994) 28 Cal.App.4th 8, 13 (*Yaesu*).)

Section 703.010 et seq. governs property statutorily exempted from a judgment creditor's enforcement of a money judgment. Defendants rely on the

11

exemption established by section 704.115 for "[p]rivate retirement plans, including, but not limited to, union retirement plans." (§ 704.115, sub. (a)(1).) The purpose of the section 704.115 "exemption is to safeguard a source of income for retirees at the expense of creditors." (*Yaesu*, *supra*, 28 Cal.App.4th at p. 13.) Stated another way, the exemption's purpose "is to permit a judgment debtor to place funds beyond the reach of creditors, so long as they qualify for the exemption under the law, and there was no evidence the debtor used the account to hide assets." (8 Witkin, Cal. Procedure (5th ed. 2008) Enforcement of Judgment, § 204, pp. 235-236.)

"However, neither the debtor's mere compliance with the pertinent IRS rules in creating the private retirement plan nor the debtor's designation of the asset as a private retirement plan translates to an automatic exemption from execution." (*Yaesu*, *supra*, 28 Cal.App.4th at p. 13.) Rather, the fundamental inquiry is, considering all relevant factors, Was "the plan . . . designed and used for a retirement" purpose? (*Id.* at p. 14.) This is a factual inquiry, and a trial court's finding on the question is "insulated from attack on appeal" if supported by substantial evidence. (*Ibid*; see also *Schwartzman v. Wilshinsky*, *supra*, 50 Cal.App.4th at p. 626 [whether IRA was necessary to support judgment debtor and his dependents upon retirement "presented a factual issue to the trial court, upon which [judgment debtor] had the burden of proof"]; compare *id*. at pp. 622, 628, 629, fn. 7 [where facts were undisputed, it was a question of law whether 401K profit-sharing plan (established by judgment debtor's employer and administered by other employees) was exempt under section 704.115].)

Here, we need not belabor our review of the court's implied finding that Cindy did *not* design and use her plan (and the various trusts, LLCs, and property transfers thereunder) for retirement purposes. Because defendants' opening brief included only evidence favorable to their cause, rather than all "significant facts" as required under California Rules of Court, rule 8.204(a)(2)(C) (see also *Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 833 (*Filip*) ["defendants present a skewed view

12

of the facts"]), they have waived their contention that insufficient evidence supports the court's finding (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737-738).[6]

Furthermore, abundant substantial evidence supports the court's finding. This evidence includes the timing of defendants' creation of the "retirement plan" relative to the arbitration and court proceedings and rulings (*Yaesu*, *supra*, 28 Cal.App.4th at p. 14); the absence of tax benefits afforded by the plan; the appointment of Cindy's young niece as trustee and manager of the entities; Cindy's retention of control over the assets after transferring them; the movement of all of Cindy's liquid assets overseas; Norman's recognition of a need for a liability reserve but failure to provide for one; Cindy's abandonment of her prior retirement goal of buying a condo on a cruise ship; and the use of substantial funds to pay legal fees (*In re Phillips* (Bankr. N.D.Cal. 1997) 206 B.R. 196,

---

[6] Defendants support the factual recitation in their opening brief almost exclusively with declarations by Cindy, Sonia, and Norman in the record. As an example of defendants' biased briefing, their version of the arbitration proceeding is, essentially, as follows: "Before the arbitration commenced, Ms. Dalrymple reasonably believed that she would prevail in the arbitration because: (1) she had provided Mr. Cho with all available information concerning [ATI]; (2) Mr. Cho had conducted a thorough and diligent investigation of all relevant factors prior to acquiring [ATI]; and (3) [Cindy] knew the allegations in the arbitration demand to be utterly false." "At the conclusion of the arbitration, Ms. Dalrymple remained confident that she would prevail in the arbitration, believing that Mr. Cho's credibility had been totally destroyed." Yet, the interim arbitration award noted that Cindy's testimony at the hearing had conflicted significantly with the testimony of other witnesses and even with her own deposition testimony.

In their factual recitation, defendants make much of the court's denial of plaintiffs' April 7, 2011 application for a writ of attachment against defendants. But the court's order stated that, "upon further showing, [the court] may also consider a [temporary restraining order] regarding the assets in question." In May and June of 2012, plaintiffs discovered the new evidence that defendants had moved all of Cindy's liquid assets offshore. Thus, the court's prior denial of plaintiffs' writ application is entirely consistent with its later granting of a preliminary injunction.

13

203 [expenditure of funds for legal defense of judgment debtors was inconsistent with utilization for retirement purposes]).

In sum, substantial evidence supports the court's implied finding Cindy's "retirement plan" does not qualify for the section 704.115 exemption. Consequently, the assets in the New Zealand Trust and the Swiss Annuity are not exempt from plaintiffs' enforcement of their judgment against defendants.

We must still consider whether the court abused its discretion by impliedly finding that plaintiffs are likely to prevail at trial on their fraudulent transfer claim against defendants. "The Uniform Fraudulent Transfer Act . . . , codified in Civil Code section 3439 et seq., 'permits defrauded creditors to reach property in the hands of a transferee.'" (*Filip*, *supra*, 129 Cal.App.4th at p. 829.) Under Civil Code section 3439.04, subdivision (a)(1), a transfer made by a debtor is fraudulent as to a creditor, if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." "Whether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer." (*Filip*, at p. 834.) Civil Code section 3439.04, subdivision (b), contains a non-exclusive list of factors which may be considered in discerning a debtor's actual intent. These factors, known as "the 'badges of fraud'" (*Filip*, at p. 834), include "(1) Whether the transfer . . . was to an insider. [¶] (2) Whether the debtor retained possession or control of the property transferred after the transfer. [¶] (3) Whether the transfer . . . was disclosed or concealed. [¶] (4) Whether before the transfer was made . . . , the debtor had been sued or threatened with suit. [¶] (5) Whether the transfer was of substantially all the debtor's assets." (Civ. Code, § 3439.04, subd. (b)). "There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud." (*Filip*, at p. 834.) The "confluence of several [badges of fraud] can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." (*In re Acequia, Inc.* (9th Cir. 1994) 34 F.3d 800, 806.)

14

We need not belabor our review of the court's implied finding that defendants intended to defraud plaintiffs. Defendants have waived their challenge to the sufficiency of the evidence to support this finding by failing to summarize all significant facts in their opening brief.[7] Furthermore, the same evidence that supports the court's finding that Cindy's "retirement plan" was not designed or used for retirement purposes anchors the court's conclusion that defendants transferred assets with an intent to defraud plaintiffs.

*The Court Did Not Abuse Its Discretion by Finding that Plaintiffs Bore the Greater Risk of Suffering Interim Harm*

The court did not abuse its discretion by impliedly finding that plaintiffs were likely to sustain greater interim harm if the injunction were denied, than the harm defendants were likely to suffer if the injunction issued.[8] "[T]he more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue." (*King v. Meese* (1987) 43 Cal.3d 1217, 1227.)

---

[7] Instead of discussing the badges of fraud in their appellate briefs, defendants stress that any fraudulent intent is irrelevant if Cindy's retirement plan is exempt under section 704.115.

[8] A related question is whether "failure to provide interim relief will cause irreparable harm." (*Barajas v. City of Anaheim* (1993) 15 Cal.App.4th 1808, 1813.) The term "'irreparable injury'" "means that species of damages, whether great or small, that ought not to be submitted to on the one hand or inflicted on the other." (*Anderson v. Souza* (1952) 38 Cal.2d 825, 834.) Such injury can consist of the dissipation of assets, the making of disbursements which cannot be adequately traced (*Wind v. Herbert*, *supra*, 186 Cal.App.2d at p. 285), or the disposal of property which "would render the final judgment ineffectual" (*Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 136.)

15

Defendants bear the burden of clearly showing an abuse of discretion. Yet, for purposes of comparing the parties' respective risks of suffering interim harm, defendants fail to articulate what harm they will suffer if forced to return the overseas assets to the United States.

In contrast, plaintiffs argue that defendants' confinement overseas of $3 million — i.e., all of Cindy's and her entities' liquid assets — "further sequester[s] assets beyond the jurisdiction of the Court, thereby leaving [plaintiffs] with an 'empty judgment' that cannot be collected." As stated by plaintiffs, "based on [defendants'] actions since the arbitration proceeding was first instituted, it is clear that they go to any lengths to keep [Cindy's] assets beyond [plaintiffs'] reach . . . ." In a recently published opinion, we held that the trial court had personal jurisdiction over AsiaTrust, the trustee of the New Zealand Trust, which had moved to quash service of summons for lack of personal jurisdiction. (*Gilmore Bank v. AsiaTrust New Zealand LTD.*, *supra*, 223 Cal.App.4th at p. 1576.) Obviously, plaintiffs would suffer severe interim harm if defendants or their instrumentalities were to further transfer and conceal the overseas assets in order to evade California's jurisdiction and plaintiffs' reach.

The court did not abuse its discretion by granting the preliminary injunction requiring defendants to repatriate the assets in question, which include the $2.2 million plaintiffs paid Cindy for her now defunct company.

16

DISPOSITION

We affirm the court's order granting plaintiffs' motion for a preliminary injunction. Plaintiffs are entitled to their costs on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

17